UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES ANTHONY CARTER JR.,

                          Plaintiff,

    -against-

A. AKINYOMBO, Deputy Superintendent of Health
Services; K. NGBODI, Nurse Practitioner; M.
BABY, Nurse Practitioner (also known as
"Thomas"); MICHELLE CENTANNI, Registered
Nurse,

                          Defendants.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __6/27/2022__

No. 21-CV-00872 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Plaintiff James Anthony Carter Jr. ("Plaintiff"), brings this action *pro se* under 42 U.S.C. § 1983 ("Section 1983") for alleged Eighth Amendment violations during his incarceration at Fishkill Correctional Facility, (*see* Second Amendment Complaint ("SAC," ECF No. 20)), against Defendants Deputy Superintendent of Health Services Akinola Akinyombo ("Akinyombo"), Nurse Practitioner Katie Ngbodi ("Ngbodi"), Nurse Practitioner Mariamma Baby (also known as "Thomas"), (collectively, "Served Defendants") and Registered Nurse Michelle Centanni ("Centanni").[1] Plaintiff seeks, inter alia, $5,5,000,000 in compensatory and punitive damages. (SAC ¶ 12.)

Presently before the Court is Served Defendants' motion to dismiss Plaintiff's Second Amendment Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). For the following reasons, Served Defendants' motion to dismiss is GRANTED.

---

[1] The SAC contains allegations against Defendant Centanni. However, Centanni has not been properly served in this action because Plaintiff never requested for a summons to be issued for Centanni.

# BACKGROUND

## I.    Factual Background

The following facts are derived from the SAC and are taken as true and construed in the light most favorable to Plaintiff for the purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff was an inmate at Fishkill Correctional Facility ("Fishkill").[2] (SAC ¶ 1.) Plaintiff alleges the medical and administrative staff at Fishkill failed to provide adequate medical care and displayed deliberate indifference to his serious medical needs. (*Id.* ¶ 23.) On June 1, 2018, Plaintiff was seen by Dr. Bernstein during which Plaintiff complained of excruciating pain in his left hip. (*Id.* ¶ 1.) Dr. Bernstein examined Plaintiff and ordered an x-ray. (*Id.*) In August of 2018, an x-ray of Plaintiff's left and right hip was performed by Dr. Bernstein at Fishkill. (*Id.*) The results of the x-ray revealed "Degenerative Osteoarthritis severe Lt. Hip." (*Id.*) Dr. Bernstein informed Plaintiff that the only way to stop the pain would be to replace the hip. (*Id.*)

On September 6, 2018, Plaintiff saw Nurse Practitioner Ngbodi who agreed with Dr. Bernstein's diagnosis, that the only way to stop the pain is to have a hip replacement. (*Id.* ¶ 2.) Ngbodi stated that she understood the pain and suffering that Plaintiff was going through and that she would contact Albany[3] for Plaintiff to be seen by orthopedics. (*Id.*) Plaintiff saw Ngbodi again on October 24, 2018, and November 8, 2018, and begged for Ngbodi to help stop Plaintiff's pain. (*Id.*)

On or about March 28, 2019, Plaintiff was seen by Nurse Practitioner Thomas who became his primary provider. (*Id.* ¶ 3.) Plaintiff described the continuing pain in his hip. (*Id.*) Thomas

---

[2] Plaintiff was released from custody on March 23, 2021. (ECF No. 12.)
[3] The SAC generally refers to "Albany." Albany appears to refer to the Department of Corrections and Community Supervision Division of Health Services which is located at 145 Central Avenue, Albany, New York. Plaintiff alleges that Centanni's office is located there. (SAC ¶ 19.)

reviewed Plaintiff's medical chart, examined him, and reviewed the x-ray of his left hip. (*Id.*) Thomas agreed with Dr. Bernstein's diagnosis, that the only way to stop the pain is by hip replacement. (*Id.*) Thomas told Plaintiff she would consult with Albany for him to be seen by orthopedics. (*Id.*) Plaintiff alleges that if Thomas did consult with Albany, "then she consulted with Michelle Centanni whom failed to schedule plaintiff to be seen and treated by orthopedics." (*Id.*) On May 17, 2019, Plaintiff was seen by Thomas again. (*Id.*) Thomas stated that Albany was "well aware of his painful hip condition," but Albany was not going to pay for nor approve for him to be seen by orthopedics. (*Id.*) Plaintiff "warned [Thomas] about the possibility of her being in violation of federal law (8th Amendment) if she continued to ignore his painful hip condition," and Thomas "said that she is well aware of federal law" and "I know you're in pain but the only thing I can tell you right now is that you got to wait." (*Id.*) Plaintiff responded "Wait for what? I'm in extreme pain." (*Id.*)

On November 1, 2019, Plaintiff was seen by Dr. Prabu (who is not Plaintiff's doctor or care provider) and told him about his left hip pain. (*Id.* ¶ 4.) Dr. Prabu took a physical examination of Plaintiff's hip and told Plaintiff that he would consult with Albany for Plaintiff to be seen immediately by orthopedics. (*Id.*)

On December 10, 2019, Plaintiff was seen by Dr. Schwarts, an orthopedic surgeon from Mount Vernon Hospital. (*Id.* ¶ 5.) Dr. Schwarts reviewed the original August 30, 2018 x-ray and "said that surgery replacing [his] left hip was needed and the correct remedy to stop the pain." (*Id.*) Plaintiff was then scheduled to be seen by orthopedic surgeon Dr. Jonathan Holder ("Dr. Holder") who would be the one to perform the surgery. (*Id.*)

Plaintiff was seen by Dr. Holder on December 19, 2019, at the facility's regional medical unit ("RMU"). (*Id.* ¶ 6.) Dr. Holder ordered an updated x-ray of Plaintiff's hips and concluded that

the delay in treatment resulted in Plaintiff's condition worsening and that Plaintiff needed the hip replacement. (*Id.*) Dr. Holder put Plaintiff in for surgery as early as possible. (*See* Exhibit B, ECF No. 20.) (*Id.*)

On or about January 15, 2020, Plaintiff was scheduled for the hip replacement surgery at Mount Vernon Hospital. (*Id.* ¶ 7.) The surgery, however, was not performed as scheduled. (*Id.*) Plaintiff went to sick call on January 27, 2020 to ask why the surgery was cancelled. (*Id.*) Plaintiff was told the surgery would be rescheduled and that it was cancelled due to lack of bed space in the hospital for prisoners. (*Id.*) Again, on February 20, 2020, Plaintiff went to sick call asking about the rescheduling of the surgery and complaining about his hip pain. (*Id.*) Plaintiff was told that he was scheduled to see Thomas. (*Id.*)

Plaintiff was seen again by Thomas on February 24, 2020, during which Thomas informed Plaintiff that Albany had not rescheduled his surgery. (*Id.* ¶ 8.) Plaintiff alleges Thomas was well aware that the Motrin he was taking did not stop the pain.[4] (*Id.*) On March 13, 2020, Thomas again told Plaintiff that his surgery had not been rescheduled. (*Id.*) Thomas also issued Plaintiff a medical pass which reads: "no work, no stair climbing- must be housed on Flats, no prolonged walking (longer than ¼ mile), no prolonged standing (longer than 10 minutes), no lifting over 10-15 lbs., may need help if 7.15 lbs. or more, hearing aids/cane/brace, no work on ladder or heights, no work for food services, no yard may watch T.V., medical reason- physical reason." (*See* Copy of Medical Pass, Exhibit D, ECF No. 2.)[5]

Plaintiff suggested to Thomas that he be transferred to another district where there is a

---

[4] It is not clear when Plaintiff started taking the Motrin or for how long.

[5] The Court considers the exhibit Plaintiff submitted with his initial complaint. "For the purposes of considering a motion to dismiss pursuant to 12(b)(6), a court is generally confined to the facts alleged in the complaint." *Cortec Indus v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991). The court may also consider documents attached to the complaint and statements or documents incorporated into the complaint by reference. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

hospital with another orthopedic surgeon. (*Id.*) However, Thomas told Plaintiff that the medical staff at Fishkill wanted Dr. Holder to perform the surgery, and that they must wait on him. (*Id.*)

While waiting for Dr. Holder to become available, Plaintiff was still in pain and alleges that Ngbodi, Thomas, and Akinyombo deliberately and intentionally disregarded Plaintiff's pain. (*Id.*) Plaintiff filed a grievance. (*Id.*) Around March 17, 2020, the Fishkill facility was locked down due to the COVID-19 pandemic. (*Id.*)

On or about March 25, 2020, Akinyombo responded to Plaintiff's grievance. (*Id.* ¶ 9.) On or about April 22, 2020, Plaintiff attended a hearing regarding his grievance and the outcome stated that "[G]rievant's priority level on his hip surgery scheduling has been raised. Grievant will be scheduled in the nearest future." (*Id.*; *see* Exhibit C, ECF No. 20.) To ensure that his surgery would be scheduled, Plaintiff appealed the grievance twice. (*Id.* ¶ 9.) First to the superintendent of the facility, Leroy Field, and then to the Central Office Review Committee ("CORC") in Albany. (*Id.*) The responses to both appeals noted that Plaintiff was "approved for left hip surgery and will be scheduled for such based on the surgeon's schedule once routine care resumes." (*See* Exhibit C.)

A month later in April of 2020, Plaintiff wrote Akinyombo a letter asking about the surgery, describing his pain, and asking what is going to be done to help ameliorate his condition. (*Id.* ¶ 10.) Akinyombo responded that Plaintiff's priority level has been raised and he "would be going out soon." (*Id.*) Plaintiff and Akinyombo discussed the scheduling of the surgery again on May 29, 2020. (*Id.* ¶ 11.) Akinyombo told Plaintiff that he would consult with Ngbodi, Thomas, and the division of health services about rescheduling Plaintiff for surgery. (*Id.*) Akinyombo also stated that he might have Plaintiff moved to another building where there were flats to accommodate him but that the building was located at the very end of the facility and was far away from the law library, the RMU, and the commissary. (*Id.*) Plaintiff complained that the move would cause him

further hardship because it placed him further away from RMU, the law library, and commissary despite his difficulties walking. (*Id.*)

On both June 16, 2020 and June 29, 2020, Plaintiff put in for sick call asking about the rescheduling of the surgery. (*Id.* ¶ 12.) Plaintiff was also informed on June 29, 2020 that medical trips for taking inmates to knee, hip, and back surgeries had resumed. (*Id.* ¶ 12.) On July 14, 2020, Plaintiff was notified that he tested positive for COVID-19 and was moved to quarantine. (*Id.* ¶ 13.) After 10 days of quarantine, Plaintiff was moved back to the 21A building, upstairs to the L unit. (*Id.*) Plaintiff wrote to Akinyombo, asking why he was moved upstairs despite his hip condition and that he has a flat pass and needed to be on the flats. (*Id.*) Plaintiff was then moved downstairs to J Unit. (*Id.*) The new unit was still a mile and a half from the RMU, law library, and commissary. (*Id.*)

On August 17, August 30, September 25, and September 29, 2020, Plaintiff wrote to and talked to Akinyombo in person where he expressed his pain was overwhelmingly unbearable, requested to be moved to "the main which is closer to the RMU, law library and commissary." (*Id.* ¶ 14.) Plaintiff also inquired about the rescheduling of the surgery. (*Id.*) Plaintiff asked what priority status meant. (*Id.*) Akinyombo responded "right away, an extreme emergency situation." (*Id.*) However, Dr. Holder would be the one performing the surgery and Plaintiff would have to wait until he was available. (*Id.*) Plaintiff asked again, why he could not be moved to another facility where there was an orthopedic surgeon available to perform the surgery. (*Id.*) Akinyombo responded by asking when Plaintiff is going to the parole board. (*Id.*) Plaintiff responded: in November of this year. (*Id.*) Akinyombo then stated "good. We don't have to send you out, you could have it done when you get out."[6] (*Id.*)

---

[6] This statement was made in the presence of inmate Lawrence Holloway. (*See* Exhibit G, ECF No. 20 at 30.)

On October 15, 2020, Plaintiff was seen by Dr. Holder during which he ordered an up-to-date x-ray and put Plaintiff in for surgery as soon as possible. (*Id.* ¶ 15; *see* Exhibit H, ECF No. 20 at 33.) On October 20, 2020, Thomas informed Plaintiff that she would inquire with Albany again to see if the surgery had been rescheduled. (*Id.* ¶ 15.)

## II.    Procedural History

Plaintiff filed the Complaint on January 29, 2021. (ECF No. 2.) On March 1, 2021, this Court issued an Order of Service, and ordered the Office of the Attorney General to identify the names and service addresses of "each John or Jane Doe DOCCS officials of whom Plaintiff seeks to sue here." (ECF No. 9.) The Court issued a summons on March 1, 2021, stating that Defendants Akinyombo, Ngbodi, and Thomas shall reply to the Complaint within the time set forth on this summons. (ECF No. 10.)

On April 30, 2021, the Office of the Attorney General in response to a Valentin Order, filed a letter addressed to the Court stating that the most likely identities of the "John Doe[s] responsible for scheduling surgery for Plaintiff" are: LNP Antoinette Patel and RN Anita Scott. (ECF No. 13.) Plaintiff filed an Amended Complaint on June 8, 2021, adding the two names of Antoinette Patel and Anita Scott. (ECF No. 14.) On July 9, 2021, the Office of the Attorney General informed Plaintiff and the Court that the names of Antoinette Patel and Anita Scott were incorrect, and the correct individual is RN Michelle Centanni ("RN Centanni"). RN Centanni is the DOCCS individual in Albany assigned to schedule surgical appointments for inmates housed in Fishkill in 2019 and 2020. (ECF No. 18.) Upon obtaining this information, Plaintiff then filed a Second Amended Complaint on August 5, 2021, assenting new claims against RN Centanni. (ECF No. 20.) Plaintiff however has yet to request a summon or serve RN Centanni.

On January 19, 2021, Served Defendants filed a notice of motion to dismiss the SAC

pursuant to Rule 12(b)(6) (ECF No. 31), and a memorandum of law in support of the motion (ECF No. 32). Plaintiff submitted a memorandum of law in opposition to defendants' motion to dismiss. (ECF No. 33.) Lastly, the Served Defendants filed a reply memorandum of law in further support of their motion to dismiss. (ECF No. 34.)

## LEGAL STANDARD

**I.**      **Fed. R. Civ. P. 12(b)(6)**

Rule 12(b)(6) provides in relevant part that a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow [ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although documents filed *pro se* are to be liberally construed, *see Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011), even *pro se* pleadings "must contain factual allegations sufficient to raise a 'right to relief above the speculative level.'" *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 603 (S.D.N.Y. 2009) (quoting *Twombly*, 550 U.S. at 555). A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" is insufficient. *Iqbal*, 550 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Thus, while the Court is "'obligated to draw the most favorable inferences' that

8

the complaint supports, it 'cannot invent factual allegations that [the plaintiff] has not pled.'" *Parris v. New York State Dep't Corr. Servs*., 947 F. Supp. 2d 354, 361 (S.D.N.Y. 2013) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). In other words, "the duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it for him." *Joyner v. Greiner*, 195 F. Supp. 2d 500, 503 (S.D.N.Y. 2002).

## II.      42 U.S.C. § 1983

While the Plaintiff does not expressly cite to this section, it is evident from the allegations he is asserting a 42 U.S.C. § 1983 ("Section 1983") claim. Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. Cnty. of Oneida*, 375 F. 3d 206, 225 (2d Cir. 2004). To state a claim under Section 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, No. 09-CV-5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). Therefore, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *See Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998*)*; *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 354

(E.D.N.Y. 1999).

## DISCUSSION

Reading the SAC liberally, it appears Plaintiff is bringing an Eighth Amendment deliberate indifference claim against Served Defendants. Served Defendants seek to dismiss the SAC on the grounds that: (1) Defendant Akinyombo was not personally involved in Plaintiff's medical treatment; (2) any alleged delay in rescheduling Plaintiff's surgery was not sufficiently serious, and Served Defendants were not deliberately indifferent to a risk of harm to Plaintiff; and (3) Served Defendants are all entitled to qualified immunity. The Court addresses each argument below.

## I.      Personal Involvement

The SAC contains allegations that Defendant Akinyombo personally took action in connection with Plaintiff's delayed medical treatment. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "The general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required." *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692–95 (1978). The Second Circuit has held that a defendant state official has the requisite personal involvement for Section 1983 liability where: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant exhibited deliberate indifference

to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). In the context of a prisoner's lawsuit, a plaintiff must show "more than the linkage in the prison chain of command" to state a claim against a supervisory defendant. *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985). Courts have noted that "it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Greenwaldt v. Coughlin*, No. 93 CIV. 6551 (LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995); *accord Rivera v. Goord*, 119 F. Supp. 2d 327, 344 (S.D.N.Y. 2000) (prison officials who allegedly ignored letters from an inmate were not liable under Section 1983); *Woods v. Goord*, No. 97 CIV. 5143 (RWS), 1998 WL 740782, at *6 (S.D.N.Y. Oct. 23, 1998) ("Receiving letters or complaints . . . does not render [prison officials] personally liable under § 1983."); *Watson v. McGinnis*, 964 F. Supp. 127, 130 (S.D.N.Y. 1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Personal involvement could be found, however, where a supervisory official receives, acts, or investigates a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint. *See Ramos v. Artuz*, No. 00 CIV 0149 LTS HBP, 2001 WL 840131, at *8–10 (S.D.N.Y. July 25, 2001) (personal liability found where a prison official "sent plaintiff numerous letters containing some explanation or justification concerning the issues raised by plaintiff").

Here, Plaintiff alleges personal involvement by Defendant Akinyombo. Plaintiff alleges that Defendant Akinyombo became aware of Plaintiff's "deteriorating hip condition" through his grievances. (SAC ¶ 13.) Plaintiff further alleges that Akinyombo responded to his grievances by raising Plaintiff's priority level and through discussions with Plaintiff on May 29 and September

29, 2020 while Akinyombo made his rounds. (*Id.* at 14.) In *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997), the Second Circuit held that there was no personal involvement of the prison official where the official responded to the prisoner's letter by informing him that a decision had been rendered. Here, after Akinyombo gained knowledge regarding Plaintiff's medical situation, he allegedly said he would consult with Defendants Ngbodi and Thomas and the Division of Health Services about rescheduling Plaintiff for surgery. *See Ramos*, 2001 WL 840131, at *8–10 (personal involvement was found when defendant's involvement went beyond merely the receipt of complaint letters). Not only did Akinyombo respond to the grievance and some of Plaintiff's letters, he also said that he might have him moved to another part of the facility and consult with Ngbodi and Thomas about the rescheduling the surgery. (SAC ¶ 11.) Akinyombo's involvement clearly "extend[ed] beyond the mere receipt of letters." *Ramos*, 2001 WL 840131, at *8. Accordingly, the SAC has sufficiently alleged that Defendant Akinyombo was personally involved in the alleged constitutional deprivations.

## II.     Eighth Amendment Deliberate Indifference to Medical Needs

Construing the SAC liberally, Plaintiff brings an Eighth Amendment deliberate indifference claim against Served Defendants. To establish a violation of the Eighth Amendment, the following two elements must be met: (1) the alleged abuse must be "objectively, sufficiently serious"; and (2) the prison official must have a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To be entitled to relief, a plaintiff must plead and prove "deliberate indifference to his serious medical needs." *Hathaway v. Coughlin*, 37 F.3d 63, 69 (2d Cir. 1994).

### A. Objective Prong

The objective prong of a deliberate indifference claim requires courts to consider "whether the prisoner was actually deprived of adequate medical care," and, if so, whether "the inadequacy in medical care [was] sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 278–79 (2d Cir. 2006). Harm is considered "sufficiently serious" if it could "produce death, degeneration, or extreme pain," *Hill*, 657 F3d. at 122 (internal quotation marks and citations omitted), or "the failure to treat [the] condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). The standard for Eighth Amendment violations contemplates "a condition of urgency" that may result in "degeneration" or "extreme pain." *Hathaway*, 37 F.3d at 66 (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)).

"Because the objective component of an Eighth Amendment claim is necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal citations omitted). "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Id.* (emphasis in original); *see also Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Here, Plaintiff alleges that Served Defendants caused "unreasonable delay in medical treatment to stop the pain in Plaintiff's hip." (SAC ¶ 22.) On December 19, 2019, Plaintiff saw Dr.

Holder who, after ordering an updated x-ray, concluded that Plaintiff needed a hip replacement and the "delay in treatment caused [Plaintiff's] condition to get worse." (*Id.* ¶ 6.) Eight months later on August 17, 2020, Plaintiff again informed Served Defendant Akinyombo that "the pain is overwhelmingly unbearable." (*Id.* ¶ 14.) Plaintiff alleges that every doctor he saw came to the same conclusion that hip replacement surgery was the only way to remedy the pain, overtime his hip pain increased, and he repeatedly informed the Served Defendants about his excruciating hip pain. (*Id.* ¶¶ 2, 3, 8, 9.) However, Plaintiff also alleges that he received ongoing treatment from Thomas and Ngbodi. (*Id.* ¶¶ 3, 5.)

Multiple circuit courts have stated that the need for hip replacement is a serious medical need. *See, e.g.*, *Williams v. Wright*, 162 F. App'x 69, 70–72 (2d Cir. 2006); *Cain v. Huff*, 117 F.3d 1420 (6th Cir. 1997). The Court must analyze not only the nature of hip replacement surgery but whether the delay in surgery was unjustified. If there is an unjustifiable delay in obtaining necessary reconstructive surgery for a prisoner, then there is an Eighth Amendment violation. *See Delaughter v. Woodall*, 909 F.3d 130, 140 (5th Cir. 2018) (a medical administrator scheduled plaintiff's surgery but then it was unclear how the surgery got canceled causing an unjustifiable delay in plaintiff's hip surgery). Here, Plaintiff alleges in the SAC that Dr. Schwarts and Served Defendants Thomas and Akinyombo informed Plaintiff that Fishkill wanted the surgery to be performed by a specific orthopedic surgeon, Dr. Holder. (SAC ¶¶ 5, 8, 14.) Plaintiff further alleges that he was "approved for left hip surgery and will be scheduled for such based on the surgeon's schedule once routine care resumes."[7] (*Id.* ¶ 9.) Therefore, Plaintiff does not allege that he was denied a serious surgical procedure (hip replacement) or that his surgery was unjustifiably delayed. Plaintiff alleges he was approved for hip replacement surgery with Dr. Holder and was placed on

---

[7] This took place in April 2020 when the COVID-19 pandemic had halted routine care at Fishkill.

a priority level in response to his grievance. (SAC ¶¶ 3, 5, 9.) Plaintiff's surgery was subject to Dr. Holder's schedule and the delay caused by the COVID-19 pandemic. These allegations do not objectively support a finding of an unjustifiable delay.

Even if the objective prong is met under a liberal reading of the SAC, the Eighth Amendment claim would nonetheless fail because of the failure to allege facts to support the requisite subjective culpable intent as discussed below.

## B. Subjective Prong

To satisfy the subjective component of a deliberate indifference claim a plaintiff must plausibly allege that the defendant "kn[e]w[ ] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 834; *see Salahuddin*, 467 F.3d at 280 (requisite mental state "requires that . . . [defendant] act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm [would] result.") (internal quotation marks and citations omitted). Thus, the mental state required has been described as one akin to "recklessness" in criminal law. *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002). The Court notes that simple negligence, or inadvertent failure to provide adequate medical care, even if it amounts to medical malpractice, is not enough to plausibly allege deliberate indifference to an inmate's Eighth Amendment rights. *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006).

Here, there are insufficient facts alleged to support a finding that Served Defendants deliberately and intentionally disregarded Plaintiff's pain and suffering. Plaintiff did not allege that the Served Defendants had a direct role in the scheduling of surgery. Plaintiff only alleges that RN Centanni has to be the one in charge of scheduling. (SAC ¶ 16.) The outbreak of the COVID-

19 pandemic delayed the surgery by reducing bedspace, and as alleged in the SAC, Plaintiff then tested positive for the virus which required him to quarantine. (*Id.* ¶ 7.) Furthermore, before the COVID-19 pandemic, both Dr. Schwarts and Thomas informed Plaintiff that surgery was subject to the doctor's availability. (*Id.* ¶¶ 5, 8.)

Plaintiff's allegations support a finding that the Served Defendants were trying to address Plaintiff's medical needs by continuously seeing him during sick calls and contacting individuals who had a role in scheduling surgery. Plaintiff alleges Defendant Akinyombo stated that since Plaintiff was scheduled to be released soon, he could get the surgery following his release.  (*Id.* ¶ 14.) However, Plaintiff does not allege any facts that any Served Defendants refused to schedule him for surgery. Specifically, Defendant Akinyombo allegedly offered to reach out to Thomas and Ngbodi for the purposes of rescheduling the procedure and help move Plaintiff to "the flats."[8] (*Id.* ¶ 11.) Furthermore, Akinyombo was the official who granted Plaintiff's grievance and raised his priority level which indicates he lacked the culpable intent required under an Eighth Amendment claim for deliberate indifference to medical needs. None of the Served Defendants controlled or were responsible for  the COVID-19 outbreak. Nor did they control Dr. Holder's schedule or hospital bed availability. Plaintiffs' allegations do not sufficiently show that Served Defendant's had the subjective intent to deliberately disregard Plaintiff's medical needs. Accordingly, Plaintiff's Eighth Amendment deliberate indifference claim against Served Defendants is dismissed without prejudice.

### III.    Qualified Immunity

The qualified immunity doctrine protects federal and state officials from suit for acts undertaken in their official capacity if "(1) their conduct does not violate clearly established

---

[8] To assist in minimizing Plaintiff's pain due to walking.

constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Wyant v. Okst*, 101 F.3d 845, 857 (2d Cir.1996). Since the Court finds that the SAC fails to state a claim for a violation of Plaintiff's constitutional rights, the Court need not address the qualified immunity issue before it.

## CONCLUSION

For the foregoing reasons, Served Defendants' motion to dismiss is GRANTED. Plaintiff's Eighth Amendment claim against Served Defendants Akinyombo, Ngbodi, and Thomas is dismissed without prejudice.

Plaintiff is granted leave to file a Third Amended Complaint as to the Eighth Amendment claim that was dismissed without prejudice. If Plaintiff chooses to do so, Plaintiff will have until July 29, 2022, to file a Third Amended Complaint. Defendants are then directed to answer or otherwise respond by August 22, 2022. If Plaintiff fails to file a Third Amended Complaint within the time allowed, and he cannot show good cause to excuse such failure, any claims dismissed without prejudice by this Order will be deemed dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 31 and to mail a copy of this Opinion and Order to *pro se* Plaintiff at his address listed on ECF and to show service on the docket.

Dated:    June 27, 2022                                    SO ORDERED:

             White Plains, New York


_____

             NELSON S. ROMÁN

             United States District Judge