USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ____9/29/2023____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES ANTHONY CARTER JR.,

                        Plaintiff,

    -against-

A. AKINYOMBO, Deputy Superintendent of Health
Services; K. NGBODI, Nurse Practitioner; M.
BABY, Nurse Practitioner (also known as
"Thomas"); MICHELLE CENTANNI, Registered
Nurse,

                        Defendants.

---

No. 21-CV-872 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Plaintiff James Anthony Carter Jr. ("Plaintiff"), brings this action *pro se* under 42 U.S.C.

§ 1983 ("Section 1983") against Defendants Deputy Superintendent of Health Services Akinola

Akinyombo ("Akinyombo"), Nurse Practitioner Katie Ngbodi ("Ngbodi"), Nurse Practitioner

Mariamma Baby (also known as "Thomas"), and Registered Nurse Michelle Centanni

("Centanni") (collectively, "Defendants"), alleging Eighth Amendment violations during

Plaintiff's incarceration at Fishkill Correctional Facility.  (*See* Third Amended Complaint

("TAC"), ECF No. 39.)  Plaintiff also asserts a claim against Akinyombo pursuant to Title II of

the Americans with Disabilities Act.  Plaintiff seeks $5,500,000 in compensatory and punitive

damages. (TAC at Prayer for Relief.)

Presently before the Court is Defendants' motion to dismiss Plaintiff's Third Amended

Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule

12(b)(6)").  For the following reasons, Defendants' motion to dismiss is GRANTED in part and

DENIED in part.

## BACKGROUND

### I.     Factual Background

The following facts are derived from the TAC and are taken as true and construed in the light most favorable to Plaintiff for the purposes of this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[1]

Plaintiff was an inmate at Fishkill Correctional Facility ("Fishkill").[2]  (TAC ¶ 1.)  Plaintiff alleges Defendants failed to provide adequate medical care and displayed deliberate indifference to his serious medical needs.  (*See generally id.*)  On June 1, 2018, Plaintiff alerted Dr. Bernstein to "excruciating" pain in his left hip.  (*Id.* ¶ 1.)  Dr. Bernstein examined Plaintiff and ordered an x-ray.  (*Id.*)  On August 30, 2018, Dr. Bernstein took an x-ray of Plaintiff's hips.  (*Id.* at ¶ 2)  Based on the x-ray results, Dr. Bernstein concluded that Plaintiff had "degenerative osteoarthritis" in his left hip.  (*Id.*)  Dr. Bernstein informed Plaintiff that hip replacement surgery was the "only" way to "stop the pain" and "correct the problem."  (*Id.* at ¶ 3.)

On September 17, 2018, Plaintiff saw Nurse Practitioner Ngbodi, who agreed with Dr. Bernstein's diagnosis.  (*Id.* at ¶ 5.)  She agreed that hip replacement surgery was the "only" way to "stop the pain."  (*Id.*)  Although Ngbodi assured Plaintiff she would "put in a consult with Albany for Plaintiff to be seen by orthopedics," Ngbodi never did.  (*Id.* at ¶¶ 5, 7.)  Instead, she met with Plaintiff twice more, on October 24, 2018 and November 8, 2018.  (*Id.* at ¶ 7.)  Ngbodi informed Plaintiff she would not request a consultation for Plaintiff, "no matter . . . how much he complained about pain."  (*Id.*)

---

[1] The Court observes that the allegations in the Third Amended Complaint are nearly identical to those in the Second Amended Complaint, with the exception of (1) legal conclusions (*see, e.g.,* TAC at ¶ 8) and (2) alleged facts regarding events that post-date the facts alleged in the Second Amended Complaint (*see* TAC at ¶¶ 81–103).  Accordingly, the following background section largely mirrors the background section contained in this Court's prior Opinion & Order at ECF No. 35.

[2] Plaintiff was released from custody on March 23, 2021.  (ECF No. 12.)

On March 28, 2019, Plaintiff visited Nurse Practitioner Thomas, who was now Plaintiff's primary provider. (*Id.* at ¶ 9.) Plaintiff described persistent pain in his left hip. (*Id.*) Thomas reviewed Plaintiff's medical chart, examined him, and reviewed the x-ray of his left hip. (*Id.*) Thomas agreed with Dr. Bernstein's diagnosis. She agreed that hip replacement surgery was the "only" way to "stop the pain." (*Id.*) Thomas told Plaintiff she would request "Albany" schedule a consultation with an orthopedic surgeon. (*Id.* at ¶ 10.) Plaintiff visited Thomas again two months later. (*Id.* at ¶ 12.) Thomas told Plaintiff that "Albany" was "well aware of [Plaintiff's] painful hip condition" but unwilling to pay for a consultation. (*Id.*) Plaintiff "warned [Thomas] about the possibility of her being in violation of federal law (8th Amendment) if she continued to ignore his painful hip condition." (*Id.* at ¶ 14.) Thomas acknowledged she is "well aware of federal law." (*Id.*) She continued, "I know you're in pain but the only thing I can tell you right now is that you got to wait." (*Id.*) Plaintiff responded, "Wait for what? I'm in extreme pain." (*Id.*)

On November 1, 2019, Plaintiff visited Dr. Prabu and told him about his left hip pain. (*Id.* at ¶ 16.) Dr. Prabu examined Plaintiff's hip and told Plaintiff that he request a consultation. (*Id.*) Shortly thereafter, on December 10, 2019, Plaintiff was seen by Dr. Schwarts, an orthopedic surgeon from Mount Vernon Hospital. (*Id.* ¶ 20.) Dr. Schwarts reviewed Plaintiff's x-rays and agreed with Dr. Bernstein, Ngbodi, and Thomas that hip surgery was necessary to "stop the pain." (*Id.* at ¶ 22.) Dr. Schwarts then scheduled Plaintiff for an appointment with orthopedic surgeon Dr. Jonathan Holder ("Dr. Holder"), who Dr. Schwarts said "would be the one to perform his surgery. (*Id.* at ¶¶ 23–24 (emphasis in original).)

Plaintiff met with Dr. Holder on December 19, 2019 at the Fishkill Correctional Facility's regional medical unit ("RMU"). (*Id.* at ¶ 25.) Dr. Holder ordered an updated x-ray of Plaintiff's hips. Dr. Holder compared the updated x-rays with the old x-rays and concluded that delayed

treatment had worsened Plaintiff's condition.  (*Id.* at ¶ 26.)  Dr. Holder then scheduled Plaintiff for surgery as soon as possible.  (*See id.* at ¶ 27.)

Plaintiff was scheduled for hip replacement surgery with Dr. Holder on January 15, 2020. (*Id.* ¶ 28.)  The surgery was scheduled to take place at Mount Vernon Hospital.  (*Id.*)  The surgery, however, was not performed as scheduled.  (*Id.* at ¶ 29.)  Plaintiff visited sick call on January 27, 2020 to ask why the surgery was cancelled.  (*Id.* at ¶ 30.)  A staff nurse "guessed" the surgery was cancelled due to a lack of bed space.  (*Id.*)

Plaintiff visited Thomas on February 24, 2020 and March 13, 2020.  (Id. at ¶¶ 33, 38.)  At these appointments, Thomas informed Plaintiff that "Albany" had not yet rescheduled his surgery. (*Id.*)  Thomas, however, issued Plaintiff a medical pass, which read as follows: "no work, no stair climbing, must be housed on the flats, no prolonged walking (longer than 10 minutes), no lifting over 10-15 lbs., may need help if 7.15 lbs. or more, hearing aids/cane/brace, no work on ladder or heights, no work for food services, no yard may watch T.V., medical reason- physical reason." (*See id.* at ¶ 60.)

Plaintiff suggested to Thomas that Defendants transfer Plaintiff to another district where Plaintiff could undergo hip replacement surgery with another orthopedic surgeon.  (*Id.* at ¶ 39.) Thomas informed Plaintiff that the medical staff at the correctional facility wanted Dr. Holder to perform the surgery.  (*Id.* at ¶ 41.)

Plaintiff then filed a grievance seeking to expedite his surgery.  (*Id.* at ¶ 50.)  Akinyombo approved  Plaintiff's grievance on April 22, 2020, elevating the priority level for scheduling Plaintiff's surgery.  (*Id.*)  To "make sure" his surgery would be scheduled, Plaintiff twice appealed the grievance.  (*Id.* at ¶¶ 51–52.)  He received two favorable decisions, both of which affirmed the increased priority level for Plaintiff's surgery.  (*Id.*)  Plaintiff was informed his surgery would "be

scheduled . . . based on the surgeon's schedule once routine care resumes." (*Id.* at ¶ 52.)

That same month, Plaintiff wrote Akinyombo a letter asking about the surgery, describing his pain, and asking which steps Defendants would take to address Plaintiff's condition. (*Id.* ¶ 54.) Akinyombo reiterated that "he had raised" the priority level of Plaintiff's surgery. (*Id.* at ¶ 55.) Akinyombo assured Plaintiff he "would be going out soon." (*Id.*) Pending Plaintiff's surgery, Akinyombo later suggested moving Plaintiff to another building where there were "flats" to accommodate him. (*Id.* at ¶¶ 58, 61.) Plaintiff complained, however, that the move would only cause further hardship because the building was located far from the law library, RMU, and commissary and thus required Plaintiff to walk a long distance. (*Id.*)

After contracting COVID-19 in July and quarantining for 10 days thereafter (*id.* at ¶¶ 64–67), Plaintiff communicated with Akinyombo multiple times in the months of August and September. (*Id.* at ¶¶ 68–75.) Plaintiff continued to express that his pain was "overwhelmingly unbearable" (*id.* at ¶ 72), and he requested relocation closer to the law library, RMU, and commissary (*id.* at ¶¶ 68–71). While discussing the surgery with Akinyombo, Plaintiff asked what "priority status" meant. (*Id.* at ¶ 75.) Akinyombo responded, "Right away, [a]n extreme emergency situation." (*Id.*) Plaintiff, Akinyombo added, needed to "wait" for Dr. Holder to become available because "[h]e will be the one who will perform the surgery." (*Id.*) Plaintiff then asked, "Why don't you transfer me to another facility in another district where there's a hospital with another orthopedic surgeon available who could perform the surgery?" (*Id.*) Akinyombo in turn asked Plaintiff when he was going to the parole board. (*Id.*) Plaintiff answered, "November," and Akinyombo replied, "Good. We don't have to send you out; you could have (it done) when you get out." (*Id.*)

On October 15, 2020, Plaintiff attended an appointment with Dr. Holder, during which Dr. Holder ordered updated x-rays and again referred Plaintiff for surgery as soon as possible. (*Id.* at ¶ 79.) On February 10, 2021, Plaintiff was informed he was scheduled for surgery the next day. (*Id.* at ¶ 87.) Upon arriving at Mount Vernon Hospital the next day, Plaintiff underwent blood testing. (*Id.* at ¶ 88.) Analyzing Plaintiff's tests, Dr. Holder informed Plaintiff that Plaintiff's blood count was too low. (*Id.* at ¶ 89.) Because Plaintiff's blood count was too low, Dr. Holder could not perform the surgery; otherwise, Plaintiff "would bleed out." (*Id.*) Dr. Holder ordered an emergency blood transfusion for Plaintiff. (*Id.* at ¶ 90.) Plaintiff stayed at the hospital for two weeks after his blood transfusion. (*Id.* at ¶ 91.) During that time, he was prescribed medication to raise his blood count and placed on a high iron diet. (*Id.*) Plaintiff alleges Thomas was aware of Plaintiff's blood count prior to surgery yet did not prescribe Plaintiff medication or advise any dietary changes. (*Id.* at ¶ 92.)

On March 23, 2021, Plaintiff was released from Fishkill Correctional Facility. (*Id.* at ¶ 97.) Plaintiff underwent hip replacement surgery a month later. (*Id.* at ¶ 98.) He used his private insurance to cover the costs of the surgery. (*Id.* at ¶ 99.) Although the surgeon told Plaintiff that "he should be walking without pain or mobility assistance within six months of the surgery" (*id.* at ¶ 100), as of the date of filing, Plaintiff continues to "experience chronic pain in his left hip" (*id.* at ¶ 101), "use a cane" (*id.* at ¶ 102), and "walk[] with a limp" (*id.*).

## II.   Prior Opinion & Order

On June 27, 2022, this Court issued an Opinion & Order dismissing Plaintiff's Second Amended Complaint and granting Plaintiff leave to file a Third Amended Complaint. (ECF No. 35.) The Court found that Plaintiff failed to state a claim for deliberate indifference. (*Id.* at 12–16.) The Court reasoned that Plaintiff's allegations did not "objectively support a finding of

unjustifiable delay" because "Plaintiff's surgery was subject to Dr. Holder's schedule and the delay caused by the COVID-19 pandemic." (*Id.* at 15.)  Moreover, the Court concluded Defendants did not possess the "subjective intent to deliberately disregard Plaintiff's medical needs" because "[n]one of the . . . Defendants controlled or were responsible for the COVID-19 outbreak" and Defendants did not "control Dr. Holder's schedule or hospital bed availability." (*Id.* at 16.)

## LEGAL STANDARD

### I.      Fed. R. Civ. P. 12(b)(6)

Rule 12(b)(6) provides in relevant part that a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.

The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claim "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 555.  A motion to dismiss will be denied where the allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

Although documents filed *pro se* are to be liberally construed, *see Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011), even *pro se* pleadings "must contain factual allegations sufficient to raise a 'right to relief above the speculative level.'"  *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 603 (S.D.N.Y. 2009) (quoting *Twombly*, 550 U.S. at 555).  A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" is insufficient.  *Iqbal*, 550 U.S. at 678 (quoting *Twombly*,

550 U.S. at 557).  Thus, while the Court is "'obligated to draw the most favorable inferences' that the complaint supports, it 'cannot invent factual allegations that [the plaintiff] has not pled.'" *Parris v. New York State Dep't Corr. Servs*., 947 F. Supp. 2d 354, 361 (S.D.N.Y. 2013) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)).  In other words, "the duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it for him."  *Joyner v. Greiner*, 195 F. Supp. 2d 500, 503 (S.D.N.Y. 2002).

## II.      42 U.S.C. § 1983

While the Plaintiff does not expressly cite to this section, it is evident from the allegations he is asserting a 42 U.S.C. § 1983 ("Section 1983") claim.  Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."  42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. Cnty. of Oneida*, 375 F. 3d 206, 225 (2d Cir. 2004).  To state a claim under Section 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution."  *Castilla v. City of New York*, No. 09-CV-5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).  Therefore, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges.  *See Annis v. Cnty. of Westchester*, 136

F.3d 239, 245 (2d Cir. 1998*)*; *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999).

## DISCUSSION

The Court liberally construes *pro se* Plaintiff's Third Amended Complaint to assert the same Eighth Amendment claims that Plaintiff alleged in the Second Amended Complaint and that the Court dismissed without prejudice.  Plaintiff also brings  a claim against Akinyombo under Title II of the Americans with Disabilities Act.

A review of the Second Amended Complaint and Third Amended Complaint reveals that the facts alleged in both pleadings are substantially the same with some minor variations.  The Third Amended Complaint also includes newly-pled facts post-dating the facts alleged in the Second Amended Complaint.  Because the Court has already issued an Opinion & Order dismissing Plaintiff's Second Amended Complaint, and because Plaintiff has filed a Third Amended Complaint that includes allegations substantially similar to those in the Second Amended Complaint,  the Court must consider the "law of the case" doctrine.

Under the "law of the case" doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983); *see also United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009).  "Law of the case directs a court's discretion, [but] it does not limit the tribunal's power." *Id.*; *see also Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999) ("The doctrine expresses, in shorthand fashion, a practice of courts generally not to reconsider that which has already been decided. But it does not purport to be a legally binding limitation on the court's authority to reconsider such matters.").  However, "[a] court's reconsideration of its own earlier decision in a case" requires "compelling circumstances, consisting principally of (1) an intervening

change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *Carr*, 557 F.3d at 102.

Upon a second review of the allegations, and in the exercise of its discretion, the Court finds it necessary to issue a new analysis of Plaintiff's claims. Although the Court still dismisses the majority of Plaintiff's claims, the Court acknowledges its prior analysis unintentionally disregarded Plaintiff's pre-December 2019 allegations (*see* ECF No. 35 at 13–15). As made clear in the following analysis, considering Plaintiff's pre-December 2019 allegations results in a different disposition of Plaintiff's claim against Defendant Ngbodi. Such due consideration also changes the Court's analysis of the objective prong of the Eighth Amendment analysis for all claims. As a result, applying the "law of the case" doctrine and doubling down on the Court's prior analysis would constitute a clear error of law. To prevent manifest injustice, the Court reviews the Third Amended Complaint without deference to the Court's prior rulings.

## I.    Eighth Amendment Deliberate Indifference to Medical Needs

Construing the Third Amended Complaint liberally, Plaintiff brings an Eighth Amendment deliberate indifference claim against Defendants. To establish a violation of the Eighth Amendment, the following two elements must be met: (1) the alleged abuse must be "objectively, sufficiently serious"; and (2) the prison official must have a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To be entitled to relief, a plaintiff must plead and prove "deliberate indifference to his serious medical needs." *Hathaway v. Coughlin*, 37 F.3d 63, 69 (2d Cir. 1994).

### A.  Objective Prong

The objective prong of a deliberate indifference claim requires courts to consider "whether the prisoner was actually deprived of adequate medical care," and, if so, whether "the inadequacy

in medical care [was] sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 278–79 (2d Cir. 2006). Inadequacy in medical care is "sufficiently serious" if it is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (quotations and citations omitted). There are several factors that courts may consider when deciding whether a medical condition is "sufficiently serious," including "whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). Whether adequate care is delayed or interrupted, *Smith v. Carpenter*, 316 F.3d 178, 185–87 (2d Cir. 2003) ("[I]t is undisputed that Smith was receiving HIV medication and other necessary medical care for his condition. His lawsuit only challenges the defendants' failure to provide him with prescription HIV medication during a seven-day period in October 1998 and a five-day period in January 1999."), or whether adequate care was never provided, *id.* at 186 ("[T]he failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment."), the relevant inquiry is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Id.* (citing *Chance*, 143 F.3d at 702–03).

As stated above, the Court's prior analysis, admittedly, painted an incomplete picture. The Court previously held Plaintiff did not meet the objective prong because Plaintiff "was approved for hip replacement surgery with Dr. Holder and was placed on a priority level [in April 2020] in response to [Plaintiff's] grievance." (ECF No. 35 at 14.) "Plaintiff's surgery," reasoned the Court,

"was subject to Dr. Holder's schedule and the delay [in surgery] caused by the COVID-19 pandemic." (*Id.* at 15.)  The Court concluded that these allegations did not "objectively support a finding of an unjustifiable delay." (*Id.*)

The Court, however, neglected to consider the eighteen months preceding Plaintiff's appointment with Dr. Holder.  Not doing so constituted clear error.  On June 1, 2018, Plaintiff complained to Dr. Bernstein of "excruciating pain in his left hip," prompting Dr. Bernstein to order an x-ray of Plaintiff's hips.  (TAC at ¶ 1.)  On August 30, 2018, Dr. Bernstein informed Plaintiff that Plaintiff had "degenerative osteoarthritis" in his left hip.  (*Id.* at ¶ 2.)  Although Dr. Bernstein prescribed Tylenol "for short term pain management," he made clear that "the only way to stop the pain and correct the problem is to replace the hip." (*Id.* at ¶ 3.)  Each medical provider that Plaintiff visited reiterated the same set of conclusions: Plaintiff has degenerative osteoarthritis in his left hip, and the *only* way to "stop the pain" is to perform total hip replacement surgery.  (*See id.* at ¶¶ 5, 9, 18, 22, 26.)  Because his providers were in agreement that surgery was the *only* way to address Plaintiff's underlying condition, an alternative form of treatment would have done Plaintiff little good.  Put differently, hip replacement surgery was the *only* adequate form of treatment to address Plaintiff's degenerative osteoarthritis.  *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("In certain instances, a physician may be deliberately indifferent if he or she consciously chooses "an easier and less efficacious" treatment plan." (citation and quotations omitted)); *see also Sulton v. Wright*, 265 F. Supp. 2d 292, 298 (S.D.N.Y. 2003), *abrogated on other grounds by Richardson v. Goord*, 347 F.3d 431 (2d Cir. 2003) ("[E]ven if an inmate receives 'extensive' medical care, a claim is stated if, as here, the gravamen of his problem is not addressed." (citing *Archer v. Dutcher*, 733 F.2d 14, 16–17 (2d Cir.1984)); *Benjamin v. Schwartz*, 299 F. Supp. 2d 196 (S.D.N.Y. 2004), *aff'd sub nom. Benjamin v. Koeningsmann*, 204 F. App'x

12

979 (2d Cir. 2006) (denying motion to dismiss where non-life-threatening arm injury was diagnosed "definitively," necessitating surgery, but surgery was not performed for another year after that).

The deprivation is sufficiently serious.  Tailoring the medical need inquiry to the "specific circumstances" alleged here," *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003), the Court finds relevant a number of unique factors, including the degenerative nature of Plaintiff's condition (*see, e.g.,* TAC at ¶ 2), the narrow course of treatment necessary to prevent degeneration (*see, e.g., id.* at  ¶ 3), the delay in scheduling that treatment (*see generally id.*), and the damage caused by the delay (*see, e.g., id.* at ¶ 26).   Like a tooth cavity, a degenerative hip condition is one that, "left untreated indefinitely," "is likely to produce agony" and "degenerate with increasingly serious implications if neglected over sufficient time."  *Compare Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (observing that a "tooth cavity is *not* a serious medical condition," but may "degenerate" and therein present a "serious medical need" (emphasis added)) *with Williams v. Wright*, 162 F. App'x 69, 70–71 (2d Cir. 2006) ("The parties agree that [plaintiff's]  degenerative hip condition constituted an objectively serious medical condition for purposes of Eighth Amendment analysis.").  Plaintiff has alleged as much: in addition to experiencing "excrutiating" (TAC at ¶ 1), "extreme" (*id.* at. ¶ 14), and "overwhelmingly unbearable" (*id.* at ¶ 72) pain, Plaintiff alleges Dr. Holder informed him in December 2019 that "the delay in treatment had caused further injury to Plaintiff."  (*Id.* at ¶ 26.)  As a result of this delay in treatment, Plaintiff "continues to experience chronic pain in his left hip" (*id.* at ¶ 101), "use[s] a cane" (*id.* at ¶ 102), and "walks with a limp" (*id.*).  Put together, Plaintiff experienced acute pain and now bears chronic pain and injuries as a result of the inadequate medical care; seen together, Plaintiff's condition was and is one "a reasonable doctor or patient would find important and worthy of comment or treatment,"

*Chance*, 143 F.3d at 702.  As such, the deprivation here is sufficiently serious.  Plaintiff has thus

met the objective prong of the deliberate indifference analysis.

The Court now turns to the subjective prong of the analysis.

## B. Subjective Prong

To satisfy the subjective prong, a plaintiff must allege that the defendant's failure to

provide medical treatment was more than mere negligence.  *Smith*, 316 F.3d at 184 ("Because the

Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for

state tort law, not every lapse in prison medical care will rise to the level of a constitutional

violation."); *Hill*, 657 F.3d at 123 ("[A] complaint that a physician has been negligent in

diagnosing or treating a medical condition does not state a valid claim of medical mistreatment

under the Eighth Amendment.").  Instead, the defendant must act with deliberate indifference, or

"culpable recklessness."  *Hill*, 657 F.3d at 123.  In order to plead culpable recklessness based on a

defendant's denial of treatment, a plaintiff must, at a minimum, allege that the defendant knew that

a substantial risk could result from the denial of treatment.  *See Hayes v. New York City Dep't of*

*Corrections*, 84 F.3d 614, 620 (2d Cir. 1996) ("[A] prison official has sufficient culpable intent if

he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk

by failing to take reasonable measures to abate the harm.") (internal citations omitted); *see also*

*Hart v. Goord*, No. 08CV681, 2011 WL 1198414, at * (W.D.N.Y. Jan. 13, 2011) ("[S]ubjective

recklessness can satisfy the deliberate indifference standard only where the official has actual

knowledge that the prisoner faced a substantial risk of serious harm and disregards that risk by

failing to take reasonable measures to abate it.") (internal citations omitted).

1. <u>Defendant Ngbodi</u>

Plaintiff plausibly alleges Defendant Ngbodi acted with deliberate indifference.  Taking Plaintiff's allegations as true, Ngbodi received Plaintiff's x-rays and medical charts and was informed of Dr. Bernstein's diagnosis and prognosis.  (TAC at ¶ 1–3, 5.)  Ngbodi knew Plaintiff was diagnosed with severe, degenerative osteoarthritis.  (*See id.* at ¶¶ 2, 5)  Ngbodi knew Plaintiff experienced "excruciating" pain as a result of this condition.   (*See id.* at ¶¶ 1, 5.)  And Ngbodi knew a hip replacement surgery was the only appropriate treatment for remedying the underlying condition.  (*See id.* at ¶¶ 3, 5.)  Put differently, Ngbodi knew ignoring Plaintiff's condition would result in the condition growing worse over time.   Despite Ngbodi's knowledge of Plaintiff's condition and the risks of ignoring it, Ngbodi explicitly disregarded these risks.  *See Dotson v. Fischer*, 613 F. App'x 35, 38–39 (2d Cir. 2015) (vacating district court's dismissal of deliberate indifference claim where doctors reviewed diagnosis and recommendations for plaintiff's condition—which "demanded urgent care"—and nonetheless rejected the recommendations, allowing plaintiff to go unexamined and delaying surgery a full year); *Benjamin*, 299 F. Supp. 2d at 201 (S.D.N.Y. 2004) (denying motion to dismiss where doctor "deliberately" failed to schedule plaintiff's surgery for two years, even though doctor knew "excessive delay could mean permanent disability").  Ngbodi informed Plaintiff she would not "consult with Albany" to schedule a consult with an orthopedic surgeon, "no matter . . . how much he complained about pain."  (TAC at ¶ 7.) By *actively* refusing to request a consultation with an orthopedic surgeon, Ngbodi served as a bottleneck, preventing Plaintiff from accessing necessary treatment.  *Cf. Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023) (explaining that subjective intent may turn *not* on "whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises" (emphasis in original)).

15

Ngbodi's indifference is reinforced by Dr. Prabu's conduct.  A year after Ngbodi refused to request a consultation, Dr. Prabu examined Plaintiff and determined a consultation was necessary.  (TAC at ¶¶ 16, 18.)  Within six weeks, Dr. Schwarts, an orthopedic surgeon, examined Plaintiff and reaffirmed what Ngbodi already knew: surgery was necessary to address Plaintiff's condition.  (*Id.* at ¶¶ 20–22.)  Nine days later, Dr. Holder, another orthopedic surgeon, ordered updated x-rays and examined Plaintiff.  (*Id.* at ¶¶ 25–26.)  Dr. Holder reaffirmed the findings of Dr. Bernstein, Ngbodi, and Dr. Prabu: again, surgery was necessary to address Plaintiff's condition.  (*Id.* at ¶ 27.)  Dr. Holder also told Plaintiff that "the delay in treatment had caused further injury to Plaintiff."  (*Id.* at ¶ 26.)  Dr. Holder then scheduled Plaintiff for surgery.  (*Id.* at ¶ 27.)  Whereas Dr. Prabu requested a consult for an orthopedic surgeon in November 2019—which led to the scheduling of Plaintiff's surgery by the next month—Ngbodi refused to request a consult, "no matter . . . how much [Plaintiff] complained about pain."  Whereas Dr. Prabu served as a conduit for Plaintiff's care,[3] Ngbodi impeded it. *See Dotson v. Fischer*, 613 F. App'x 35, 38–39 (2d Cir. 2015) (denying motion to dismiss where defendants rejected doctor's recommendation that plaintiff's condition required "urgent care," thus ultimately delaying plaintiff's required surgery for another year); *Kucharczyk v. Westchester Cnty.*, 95 F. Supp. 3d 529, 542 (S.D.N.Y. 2015) (denying motion to dismiss where plaintiff plausibly alleged (1) he told defendant doctor he was "in severe pain and at risk of future harm" and (2) defendant knew plaintiff "needed surgery" and "was approved," but defendant "ignored [plaintiff's] request for help" by refusing to schedule

---

[3] The required minimum level of care is quite low.  *See Vining v. Dep't of Corr.*, No. 12–CV–3267, 2013 WL 2036325, at *6 (S.D.N.Y. Apr. 5, 2013) (granting motion to dismiss where plaintiff did not allege defendants "intended or engineered" delayed provision of care, but rather the delay was due to "scheduling errors" and "inadequate advocacy," *i.e.*, plaintiff "fell victim to the impersonal dynamic of prison medical logistics").  Taking the allegations as true, Ngbodi failed to meet even this minimal level of care.

the surgery "because Plaintiff's injuries were not life threatening").  Although discovery may disprove Plaintiff's allegations, Plaintiff states a claim as to Ngbodi.

### 2. Defendant Thomas

Plaintiff fails to plausibly allege Defendant Thomas acted with deliberate indifference. First, Plaintiff alleges Thomas told Plaintiff on March 28, 2019 that "she would consult with Albany" to request a consultation with an orthopedic surgeon.  (TAC at ¶¶ 9–10.)  Thomas informed Plaintiff at Plaintiff's next appointment on May 17, 2019 that "Albany was not going to pay for nor approve for Plaintiff to be seen by orthopedics even though they are aware of his painful hip condition."  (*Id.* at ¶ 12.)  When warned by Plaintiff that she was "in violation of federal," Thomas lamented, "I know you're in pain but the only thing I can tell you right now is that you got to wait."  (*Id.* at ¶ 14.)  Although the allegations suggest Thomas engaged in "inadequate advocacy" on Plaintiff's behalf, the allegations do not spell out the "intended or engineered" delayed provision of care, as they do for Ngbodi.  *See Vining*, 2013 WL 2036325, at *6. At no point did Thomas reject Plaintiff's need for surgery or otherwise create a bottleneck impeding Plaintiff's access to treatment.

Plaintiff also alleges that in February, March, and October of 2020, Plaintiff had appointments with Thomas.  (TAC at ¶¶ 33, 38, 81.)  At all three appointments, Plaintiff complained to Thomas that he had pain in his left hip, and he asked if his surgery had been rescheduled. (*Id.*)  Each time Thomas answered, "No." (*Id.*)  At one point, Plaintiff asked Thomas if "he could be transferred to another district where there's a hospital with another orthopedic surgeon who could perform the surgery."  (*Id.* at ¶ 39.)  Thomas responded that either hospital or prison officials "wanted" one specific surgeon, Dr. Holder, to perform the surgery.  (*Id.* at ¶ 41)  Plaintiff again falls short of alleging culpable recklessness; far from denying Plaintiff treatment,

Thomas communicated—as requested by Plaintiff—with Albany regarding Plaintiff's surgery. Thomas did not create a bottleneck impeding Plaintiff's access to care. To the contrary, Thomas agreed with Plaintiff's course of treatment. Beyond more zealous advocacy, Plaintiff alleges nothing Thomas could have done differently to prevent the deprivation. *See, e.g., Webb v. Jackson*, No. 92 CIV. 2149 (SS), 1994 WL 86390, at *3 (S.D.N.Y. Mar. 16, 1994), *aff'd*, 47 F.3d 1158 (2d Cir. 1995) (Sotomayor, J.) (dismissing deliberate indifference claim where defendant "had no control" over delay in plaintiff's surgery because defendant was "not responsible for scheduling appointments" or "making referrals"). Because Thomas had no authority to schedule Plaintiff's surgery in the first place, and because Plaintiff alleges nothing to suggest Thomas impeded Plaintiff's course of treatment, these allegations do not amount to culpable recklessness.

Nor do Plaintiff's medication-related allegations show Thomas's deliberate indifference. Plaintiff alleges Thomas continued to prescribe Motrin to Plaintiff for pain management, even though Plaintiff made clear to Thomas that the medication "did not stop the pain." (TAC at ¶ 36; *see id.* at ¶¶ 95–96.) These allegations are deficient. Although Thomas acknowledged hip surgery was the only solution to Plaintiff's degenerative condition, Thomas had no control over when surgery would take place and Thomas did not impede the scheduling of Plaintiff's surgery. *See, e.g., Webb*, 1994 WL 86390, at *3. Plaintiff does not allege Thomas could have provided treatment—short of surgery—beyond pain management and assistive measures. If anything, Plaintiff's allegations show Thomas tried to make Plaintiff as comfortable as possible pending surgery. Thomas continued Plaintiff's pain management regimen and issued a medical pass to Plaintiff, which included the following accommodations: "no work," "no stair climbing," "must be housed on the flats," "no prolonged walking," "no lifting over 10-15 lbs.," "hearing aids/cane/back brace," and television privileges. (TAC at ¶ 60.)

The remaining allegations likewise fail to show deliberate indifference. These allegations center on Plaintiff's surgery scheduled for February 11, 2021, which Dr. Holder cancelled because Plaintiff's blood count was "too low." (*Id.* at ¶¶ 88–89.) Plaintiff accuses Thomas of knowing Plaintiff's low blood count but failing to prescribe Plaintiff any medication to raise his blood count or otherwise change Plaintiff's diet. (*Id.* at ¶ 92.) In this way, alleges Plaintiff, Thomas "deliberately interfered" with Plaintiff's surgery by "failing to address [Plaintiff's] low blood count." (*Id.* at ¶ 94.) These allegations, taken as true, at best amount to a difference in medical judgment regarding the implications of Plaintiff's blood count. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking."); *see also McKenna v. Wright*, No. 01-CV-6571, 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002) ("While a plaintiff may be able to state an Eighth Amendment claim where a doctor acts without medical justification, no claim is stated when a *doctor* disagrees with the professional judgment of another doctor." (quotations omitted)). Plaintiff does not allege Thomas knew Plaintiff's blood count was so low as to render surgery unsafe. Nor does Plaintiff allege Thomas had an ulterior motive for interpreting the blood tests as she did, such as further delaying Plaintiff's surgery. *See Chance v. Armstrong*, 143 F.3d 698, 704 (2d Cir. 1998) ("[The] allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment."). These allegations do not show Defendant's deliberate indifference.

Plaintiff's claim is dismissed without prejudice.

3.  <u>Defendant Akinyombo</u>

For the same reasons articulated in the Court's prior Opinion & Order (*see* ECF No. 35 at 16), Plaintiff fails to plausibly allege Defendant Akinyombo acted with deliberate indifference. With respect to Akinyombo, Plaintiff's allegations are confined to a six-month period of time: (1) on April 22, 2020, Akinyombo responded to Plaintiff's grievance by raising the priority level of Plaintiff's surgery (TAC at ¶ 50); (2) that same month, Akinyombo again informed Plaintiff that he had raised the priority level of Plaintiff's surgery (*id.* at ¶ 55); (3) on May 29, 2020, Akinyombo reiterated the priority level of Plaintiff's surgery and suggested moving him to a more accessible section of the facility, albeit farther from the "RMU" (*i.e.*, regional medical unit), commissary and law library (*id.* at ¶ 58); and (4) on September 29, 2020, Akinyombo informed Plaintiff he was "waiting" on Dr. Holder's availability and until then, Plaintiff would have to "wait" (*id.* at ¶ 75). Plaintiff also alleges that Akinyombo, upon learning Plaintiff would go before the parole board in November of 2020, responded, "Good. We don't have to send you out; you could have (surgery) when you get out." (*Id.*) Plaintiff, in sum, alleges Akinyombo delayed Plaintiff's surgery for non-medical reasons, namely (1) "the idea that Dr. Holder was the only surgeon (who) could perform Plaintiff's surgery" and (2) Plaintiff's parole board hearing. (*Id.* at ¶ 77.)

Plaintiff's allegations might present a closer call in ordinary circumstances. As obvious from the face of Plaintiff's allegations, however, these circumstances were anything but normal. During Akinyombo's personal involvement in Plaintiff's medical care, one common factor remained: the COVID-19 pandemic. Plaintiff, unfortunately, was not immune from the pandemic's effects. He experienced lockdowns and quarantine, and it was only in late June of 2020 that "medical trips" for "knee, hip, and back surgeries . . . resumed." (TAC at ¶ 63.) Plaintiff saw Dr. Holder four months later, who again recommended surgery. (*Id.* at ¶ 79.) Plaintiff does not allege Akinyombo was involved in scheduling Plaintiff's surgery, *see, e.g., Webb*, 1994 WL

86390, at *3, let alone in control of the external factors that affected scheduling, *e.g.,* the COVID-19 pandemic, Dr. Holder's schedule or the availability of hospital beds. *See Henderson v. Sommer*, No. 08 CIV. 3440 RMB, 2011 WL 1346818, at *4 (S.D.N.Y. Apr. 1, 2011) (dismissing deliberate indifference claim where delay in surgery was due in part to "a third party's scheduling constraints"). Plaintiff's most damning allegations are that Akinyombo did not transfer Plaintiff to another district or seek out another surgeon to perform Plaintiff's surgery. Without more facts, these omissions reflect, at worst, Akinyombo's "inadequate advocacy" and the "impersonal dynamic of prison medical logistics." *See Vining*, 2013 WL 2036325, at *6. An equally plausible inference, however, is that Defendant believed seeking a transfer or different surgeon would have delayed Plaintiff's surgery even longer than waiting for Dr. Holder's availability. This inference is reinforced by the unfortunate realities of the COVID-19 pandemic. (*See, e.g.,* TAC at ¶¶ 49, 64–66.) Plaintiff's allegations thus do not provide enough facts for the Court to plausibly infer Akinyombo's culpable recklessness.

Plaintiff's claim is dismissed without prejudice.

4. <u>Defendant Centanni</u>

Lastly, Plaintiff fails to plausibly allege Defendant Centanni's deliberate indifference. Plaintiff first alleges, hypothetically, that if Thomas "consult[ed] with Albany for [Plaintiff] to be seen by orthopedics," Centanni "failed to schedule Plaintiff to be seen and treated by orthopedics." (TAC at ¶¶ 10–11.) These allegations, however, lack sufficient factual detail. For example, Plaintiff alleges Thomas told him that "Albany was not going to pay for nor approve for Plaintiff to be seen by orthopedics." (*Id.* at ¶ 12.) It is unclear, however, whether "Albany" refers to Centanni or a different decision-maker. Put differently, although Plaintiff alleges Centanni "oversees scheduling" for the facility (*e.g., id.* at ¶ 6), it does not follow that Centanni *approves*

outside consultations or surgeries.  If "Albany" rejected Plaintiff's request for a consultation for "budgetary reasons," and Centanni was only responsible for *scheduling* the consultation (and not *approving*), the allegations present no basis for imposing liability, even if proven true by facts learned in discovery.  *See Rush v. Artuz*, No. 00 CIV. 3436 (LMM), 2004 WL 1770064, at *13 (S.D.N.Y. Aug. 6, 2004) (dismissing claim against prison official who did not "participate[] in any of the decisions to deny plaintiff's surgery" or otherwise inform plaintiff's primary provider of such denials.) (citing *Brock v. Wright*, 315 F.3d 158, 164–66 (2d Cir. 2003)).  Moreover, although Plaintiff alleges "Albany" was "aware of his painful hip condition" (TAC at ¶ 12), Plaintiff does not allege Centanni knew any facts regarding Plaintiff's condition.

Plaintiff's later allegations do no better.  Once Dr. Holder recommended Plaintiff for surgery, surgery was scheduled for January 15, 2020.  That surgery was cancelled, but Plaintiff "is unsure if the cancellation was carried out by Mount Vernon Hospital" or if "Fishkill officials simply refused to take him."  (*Id.* at ¶ 31.)  In fact, Plaintiff learned from a staff nurse that Mount Vernon may have lacked "bedspace" to accommodate Plaintiff.  (*Id.* at ¶ 30.)  The allegations in no way connect the delayed surgery back to Centanni.  Even though the surgery scheduled for January was cancelled and Plaintiff sought to reschedule, Plaintiff concedes that he is "unsure if Defendant Centanni" "was ever made aware of the need to reschedule."  (*Id.* at ¶ 35.)  These allegations are speculative and do not state a claim.  Plaintiff makes one last allegation, stating that after Plaintiff's October 15, 2020 appointment with Dr. Holder, Centanni again failed to reschedule Plaintiff for surgery.  (TAC at ¶ 82.)  As stated above, Plaintiff's allegation does not present a basis for imposing liability as Plaintiff does not allege Defendant was responsible for approving the surgery.  This allegation is also belied by the allegation that indeed surgery *was in fact scheduled* for February 11, 2021.  Although a four month gap separates Plaintiff's October 15, 2020

appointment and Plaintiff's February 11, 2021 scheduled surgery, Plaintiff does not allege *facts* to suggest this further delay was attributable to Centanni.  *See Hernandez v. Keane*, 341 F.3d 137, 145–46 (2d Cir. 2003) (dismissing deliberate indifference claim where "delay [in surgery] was caused by factors outside defendants' control" and "intervals attributable to defendants [were] thus reduced to a matter of months").  Without more factual detail, the Court is left to fill in the gaps. The most plausible inference the Court can draw is that Plaintiff's surgery was further delayed due to Dr. Holder's schedule or the COVID-19 pandemic.

Plaintiff fails to plead a deliberate indifference claim against Centanni.  Plaintiff's claim is dismissed without prejudice.

## II.      Qualified Immunity

The qualified immunity doctrine protects federal and state officials from suit for acts undertaken in their official capacity if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Wyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996).  At this early stage, the pleadings do not provide sufficient factual detail upon which to grant dismissal for Defendant Ngbodi on the grounds of qualified immunity.  *See Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (explaining the general rule that "the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion") (citation omitted)).

With respect to the other Defendants, since the Court finds that the Third Amended Complaint fails to state a claim for a violation of Plaintiff's constitutional rights, the Court need not address the qualified immunity issue before it.

## III.     Americans with Disabilities Act ("ADA")

Plaintiff asserts a claim against Defendant Akinyombo pursuant to Title II of the ADA.  In particular, Plaintiff alleges Akinyombo denied Plaintiff "with the necessary accommodations needed to accommodate the pain caused by Plaintiff's degenerative osteoarthritis."  Plaintiff seeks solely monetary damages.

Regardless of whether Plaintiff sues Akinyombo in his official or individual capacity, Plaintiff's claim is barred.  Insofar as Plaintiff is suing Akinyombo in his individual capacity, Title II does not provide for individual capacity suits against state officials.  *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).  Insofar as Plaintiff is suing Akinyombo in his official capacity, he is seeking damages from the State of New York.  The Eleventh Amendment shields the State of New York—and state officials sued in their official capacities—from suits for retrospective relief, including damages.  *See id.* (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).  Plaintiff's claim against Akinyombo is dismissed with prejudice.

Plaintiff also requests leave to file a Fourth Amended Complaint asserting an ADA claim against a new defendant, Fishkill Correctional Facility ("Fishkill").  Because a state correctional facility has no separate legal status from the agency which operates it—here, DOCCS—Fishkill is an entity incapable of being sued.  *See, e.g., Trail v. New York State Dep't of Corr. & Cmty. Supervision*, No. 17 CV 7273 (VB), 2018 WL 3711822, at *1 (S.D.N.Y. Aug. 3, 2018) ("Plaintiff's argument that [state correctional facility] can be sued because it is a public entity is meritless.  [The facility] may be operated by DOCCS, but that alone does not make [the facility] an entity capable of being sued.").  Plaintiff is thus denied leave to assert an ADA claim against Fishkill.

## IV.    Leave to Amend

As a final matter, although *pro se* plaintiffs are generally given leave to amend a deficient complaint, *see Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795–96 (2d Cir. 1999), a district court may deny leave to amend when amendment would be futile because the problem with the claim "is substantive [and] better pleading will not cure it," *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) ("Leave to amend should be granted unless there is evidence of undue delay, bad faith, undue prejudice, or futility."). While courts should be more lenient when considering a *pro se* party's motion to amend than when considering that of a represented party, *see in re Sims*, 534 F.3d 117, 133 (2d Cir. 2008), leave to amend is properly denied where all indications are that the *pro se* plaintiff will be unable to state a valid claim, *see Valle v. Police Dep't Cnty. of Suffolk Cent. Records*, No. 10–CV–2847, 2010 WL 3958432, at *2 (E.D.N.Y. Oct. 7, 2010) (citing *Thompson v. Carter*, 284 F.3d 411, 419 (2d Cir. 2002)).

Plaintiff is no longer incarcerated and is thus seeking monetary damages, not injunctive or declaratory relief. As such, Plaintiff's ADA claims are futile, regardless of if they are pleaded against Defendants in their individual or official capacities or against Fishkill. Because any amendment would be futile, Plaintiff's ADA claim is dismissed with prejudice.

Although the Court is likewise skeptical Plaintiff can state a Section 1983 claim against Defendants Thomas, Akinyombo, and Centanni, the Court acknowledges it has identified a different set of deficiencies with Plaintiff's pleadings than it did in its prior Opinion & Order. The Court will grant Plaintiff leave to amend his Section 1983 claims in accordance with the rulings in this Opinion & Order.

## CONCLUSION

Defendants' motion to dismiss is GRANTED in part and DENIED in part.

Plaintiff's Section 1983 claim against Defendant Ngbodi may proceed. Plaintiff's Section 1983 claims against Defendants Thomas, Akinyombo, and Centanni are dismissed without prejudice. Plaintiff's ADA claim against Defendant Akinyombo is dismissed with prejudice.

Plaintiff is granted leave to replead any claims that were dismissed without prejudice. Plaintiff is not granted leave to assert an ADA claim in the Fourth Amended Complaint. Plaintiff may file a Fourth Amended Complaint consistent with this Opinion & Order no later than November 13, 2023. Failure to file a Fourth Amended Complaint within the time allowed, and without good cause to excuse such failure, will result in dismissal with prejudice of all claims that this Court has dismissed without prejudice in this Opinion & Order. Plaintiff is further advised that an amendment to a complaint completely supplants the previous complaint. In other words, he must include all allegations he wishes to be considered in the Fourth Amended Complaint and if he fails to include any allegations he cannot rely upon the fact that he previously asserted allegations in prior complaints. The Court will not be consolidating multiple complaints. A Fourth Amended Complaint form is attached to this Opinion & Order. If Plaintiff files a Fourth Amended Complaint, Defendants are directed to answer or otherwise seek leave to move in response to the Fourth Amended Complaint no later than December 5, 2023.

If Plaintiff does not file a Fourth Amended Complaint, Defendant Ngbodi is directed to file an answer to the Third Amended Complaint no later than December 5, 2023. The parties are then directed to confer, complete, and submit to the Court the attached Case Management Plan and Scheduling Order (template attached) no later than December 29, 2023. After review and approval of the Scheduling Order, the Court will issue an Order of Reference to Magistrate Judge Andrew

E. Krause for general pretrial purposes.  Defendants' counsel is directed to contact Judge Krause within seven (7) business days of the date of the Order of Reference to schedule a conference.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 54.  The Clerk of Court is further directed to mail a copy of this Opinion and Order to *pro se* Plaintiff at his address listed on ECF and to show service on the docket.

SO ORDERED.

Dated:    September 29, 2023
          White Plains, New York

_____
          NELSON S. ROMÁN
        United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____

Write the full name of each plaintiff.


-against-

_____

_____

_____

_____

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

_____CV_____
(Include case number if one has been assigned)


**AMENDED**

**COMPLAINT**

Do you want a jury trial?
☐ Yes    ☐ No


---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☐   **Federal Question**

☐   **Diversity of Citizenship**

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

_____

_____

_____

_____

## B.   If you checked Diversity of Citizenship

### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
               (Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
                        (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

_____

First Name                  Middle Initial        Last Name

_____

Street Address

_____

County, City                            State                Zip Code

_____         _____

Telephone Number                        Email Address (if available)

**B.   Defendant Information**

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

First Name                              Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                                        State                        Zip Code

Defendant 2:

First Name                              Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                                        State                        Zip Code

Defendant 3:

First Name                              Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                                        State                        Zip Code

Defendant 4:

_____

First Name                          Last Name

_____

Current Job Title (or other identifying information)

_____

Current Work Address (or other address where defendant may be served)

_____

County, City                        State              Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

_____

_____

_____

_____

_____

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

_____

_____

_____

_____

_____

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| Dated | Plaintiff's Signature |

| | | |
|---|---|---|
| First Name | Middle Initial | Last Name |

| |
|---|
| Street Address |

| | | |
|---|---|---|
| County, City | State | Zip Code |

| | |
|---|---|
| Telephone Number | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☐ Yes    ☐ No

    If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

UNITED STATES DISTRICT COURT                                    Rev. May 2014
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

                                                    **CIVIL CASE DISCOVERY PLAN**
                              Plaintiff(s),          **AND SCHEDULING ORDER**

         - against -


                              Defendant(s).          _____ CV _____ (NSR)


-------------------------------------------------------------x

         This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with
counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

   1.    All parties [consent] [do not consent] to conducting all further proceedings before
         a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c).
         The parties are free to withhold consent without adverse substantive consequences.
         (If all parties consent, the remaining paragraphs of this form need not be
         completed.)

   2.    This case [is] [is not] to be tried to a jury.

   3.    Joinder of additional parties must be accomplished by _____.

   4.    Amended pleadings may be filed until _____. Any party
         seeking to amend its pleadings after that date must seek leave of court via motion.

   5.    Interrogatories shall be served no later than _____, and responses
         thereto shall be served within thirty (30) days thereafter.  The provisions of Local
         Civil Rule 33.3 [shall] [shall not] apply to this case.

   6.    First request for production of documents, if any, shall be served no later than
         _____.

   7.    Non-expert depositions shall be completed by _____.

         a.    Unless counsel agree otherwise or the Court so orders, depositions shall not
               be held until all parties have responded to any first requests for production
               of documents.

         b.    Depositions shall proceed concurrently.

         c.    Whenever possible, unless counsel agree otherwise or the Court so orders,

non-party depositions shall follow party depositions.

8.      Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9.      Requests to Admit, if any, shall be served no later than _____.

10.     Expert reports shall be served no later than _____.

11.     Rebuttal expert reports shall be served no later than _____.

12.     Expert depositions shall be completed by _____.

13.     Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14.     **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15.     Any motions shall be filed in accordance with the Court's Individual Practices.

16.     This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17.     The Magistrate Judge assigned to this case is the Hon. _____.

18.     If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19.     The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)


SO ORDERED.

Dated: White Plains, New York
       _____


                                                    _____
                                                    Nelson S. Román, U.S. District Judge