**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

James Anthony Carter Jr.,

                      Plaintiff,

              *v.*

Nurse Mulvihill, Akinola Akinyombo, and Katie
Ngbodi,

                  Defendants.

No. 21-cv-00872 (NSR)

## FIFTH AMENDED COMPLAINT

Plaintiff James Anthony Carter Jr., by and through his attorneys at O'Melveny & Myers LLP, hereby alleges as follows:

### NATURE OF THE ACTION

1.    Plaintiff James Anthony Carter Jr. suffered from degenerative osteoarthritis in his hips and he used a cane to assist with this debilitating condition while incarcerated at two New York State prisons: Bare Hill Correctional Facility in Malone ("Bare Hill") and Fishkill Correctional Facility in Beacon ("Fishkill").

2.    In recognition of Mr. Carter's physical limits, a nurse working for the New York State Department of Corrections and Community Supervision ("DOCCS") issued him a medical pass, which authorized his use of a cane for a "medical reason-physical reason."  It also mandated that Mr. Carter be housed in a unit that would allow him to access meals and medical services without having to climb stairs, navigate hills, or walk longer than 10 minutes.

3.      Instead of treating Mr. Carter's medical needs and accommodating his disability, however, various DOCCS employees subjected him to repeated abuse.  Prison officers violently assaulted Mr. Carter, targeting his physical vulnerabilities and aggravating his fragile condition.  They also singled out Mr. Carter, who is Black, for racial slurs and other forms of verbal abuse, thus intensifying the humiliation and psychological trauma he suffered in prison.  And when Mr. Carter tried to speak up—demanding that DOCCS employees cease violating his constitutional rights—in addition to various acts of retaliation in response to Mr. Carter's complaints, at least one prison official threatened him with death if he were to tell anyone what he had experienced.

4.      Worst of all, DOCCS employees were on notice that prison medical personnel had diagnosed Mr. Carter with degenerative osteoarthritis and that only hip replacement surgery could alleviate his extreme chronic pain.  But rather than provide this desperately needed and *medically necessary* procedure, DOCCS employees withheld care for more than two and a half years—choosing instead to brand Mr. Carter a "whiner" and "complainer" for being outspoken about the help he needed, including the need for hip replacement surgery.  DOCCS employees also failed to treat Mr. Carter for severe anemia, which further hindered his prospects for hip replacement surgery.  Indeed, DOCCS employees kept resisting Mr. Carter's pleas for humane medical care right up until the day, in 2021, he was paroled from prison.

5.      Less than a month later, as a free man, Mr. Carter underwent hip replacement surgery.

6.      Despite various threats of retaliation, Mr. Carter has nonetheless chosen to speak out—now seeking damages for his injuries, which were caused or exacerbated by Defendants.  Mr. Carter brings this lawsuit against Defendants pursuant to 42 U.S.C. § 1983 for violations under the First and Eighth Amendments to the United States Constitution.

**Bare Hill Correctional Facility**

7.      On or about March 24, 2018, when Mr. Carter was in his 50s, prison officials at Bare Hill physically assaulted him twice in the same day, leaving him in extreme pain, badly bruised, and unable to walk.  The prison officials who assaulted Mr. Carter knew of his hip condition.  Indeed, they deliberately hit him in his lower back and hip—targeting a vulnerable part of his body with extreme precision—thus causing severe injury and worsening his condition. Throughout these assaults, the officials hurled racial slurs at Mr. Carter commonly used to denigrate African Americans—repeatedly calling him the "N-word" among other cruel things— and threatened him with further physical abuse each time he pleaded with them to stop.

8.      Mr. Carter sought medical attention for his injuries, telling a medical provider at Bare Hill, Nurse Mulvihill, that he was in extreme pain.  Nurse Mulvihill told Mr. Carter that everything looked fine.  She made this determination despite refusing to examine him, order an x-ray, schedule a consultation, or take any other step to determine the extent of his injuries.

9.      When Mr. Carter complained that his medical needs were being ignored, a prison official reminded Mr. Carter that the Bare Hill facility was hundreds of miles from Mr. Carter's home in New York City—a world away from anyone who cared about him.  This official also hurled the N-word at Mr. Carter and informed him that should he tell anyone about these incidents, he would not only be beaten more severely but also marked for death, without anyone ever knowing what happened to him.

10.     Despite the retaliatory threats, Mr. Carter filed a grievance nonetheless reporting his mistreatment.  He also told his mother and sister about the unlawful beatings, threats, and verbal abuse he suffered.  Mr. Carter's sister contacted an official in Albany and begged to have

her brother moved to a facility closer to New York City.  On or about May 18, 2018, Mr. Carter was transferred from Bare Hill to Fishkill.

**Fishkill Correctional Facility**

11.    Fishkill is a notoriously troubled prison where guard-on-inmate beatings and misconduct by medical staff have contributed to "an atmosphere and a culture of violence."[1]

12.    At Fishkill, Mr. Carter continued to seek medical treatment.  He was still in extreme pain, reliant on a cane, and struggling to sleep at night.  Because of his pain and limited mobility, Mr. Carter also had difficulty getting to the mess hall in time for meals, forcing him to almost always skip breakfast and regularly skip lunch and dinner.  Fishkill failed to provide any accommodation that would to allow him to complete his meals.

13.    In summer 2018, Mr. Carter was at last treated by a Fishkill physician, Dr. Frederick Bernstein.  Dr. Bernstein ordered blood work, which revealed that Mr. Carter had low hemoglobin levels consistent with anemia.  Dr. Bernstein also ordered an x-ray of Mr. Carter's hips and diagnosed him with severe degenerative osteoarthritis in his left hip and moderate degenerative osteoarthritis in his right hip.  On or about August 31, 2018, Dr. Bernstein informed Mr. Carter that the ***only way*** to stop the chronic and debilitating pain was to replace his left hip.

---

[1] Mary Beth Pfeiffer, "State pays $450,000 to beaten inmate, one of 24 payouts," *Poughkeepsie Journal*, *available at* https://www.poughkeepsiejournal.com/story/news/local/2015/09/12/prisons-brutality-fishkill-correctional-downstate-green-haven-lawsuits-settlements-beatings-union-grievance/72159070/; *see also* Blaise Gomez, "Former Fishkill inmate awarded $2M judgment after beating by guards left him paralyzed," *News12 The Bronx*, *available at* https://bronx.news12.com/former-fishkill-inmate-awarded-2m-judgment-after-beating-by-guards-left-him-paralyzed (jury found that nurse at Fishkill repeatedly poked inmate with sharp objects in attempt to disprove that he was injured).

14.    Osteoarthritis occurs when the cartilage that covers the ends of bones and helps joints move smoothly becomes damaged.[2]  It is a degenerative condition that can make daily tasks difficult and lead to sleep disturbances due to the pain.[3]  During hip replacement surgery, the damaged sections of the hip joint are removed and replaced with other parts—typically constructed of metal, ceramic, and very hard plastic.[4]  Hip replacement surgery provides relief from pain when hip pain is interfering with daily life and non-surgical treatments have become ineffective.[5]

15.    From approximately August 31, 2018, until March 23, 2021—a period of **more than two and a half years**—Mr. Carter repeatedly pleaded with prison officials and medical providers to schedule his hip replacement surgery.  They withheld this urgent surgery that entire time.

16.    Nurse Katie Ngbodi told Mr. Carter that although she agreed with Dr. Bernstein's diagnosis—that the only way to stop his excruciating pain was with hip surgery—she would not place a request for consultation with an orthopedic specialist no matter how much pain he was in. Nurse Ngbodi, who reviewed Mr. Carter's medical records, also knew that he had been diagnosed with anemia due to his low hemoglobin levels.  Still, she **never** prescribed medication to improve his anemic condition or took any other step to address it.

---

[2] "Hip Replacement," *Mayo Clinic*, *available at* https://www.mayoclinic.org/tests-procedures/hip-replacement/about/pac-20385042

[3] "Osteoarthritis," *Mayo Clinic*, *available at* https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/syc-20351925.

[4] "Hip Replacement," *Mayo Clinic*, *available at* https://www.mayoclinic.org/tests-procedures/hip-replacement/about/pac-20385042

[5] *Id*.

17.    Mr. Carter also repeatedly pleaded with Akinola Akinyombo, the Deputy Superintendent for Health Services at Fishkill, to schedule the surgery.  Deputy Superintendent Akinyombo, to the extent he could be troubled to respond, informed Mr. Carter that his hip replacement surgery would be scheduled "in the nearest future" yet always found an excuse to delay it.  Defendant Akinyombo characterized Mr. Carter as a "whiner" and "complainer" for repeatedly asking for medical care, and when Mr. Carter tried to speak with him in person about this, Akinyombo would routinely walk away, saying "I've got to go," "I've got to go."

18.    Mr. Carter constantly complained to Deputy Superintendent Akinyombo about the failure to schedule his much-needed hip surgery.  Rather than address Mr. Carter's concerns, Deputy Superintendent Akinyombo relocated Mr. Carter to a far-flung jail cell within the Fishkill facility, which left him even further from the mess hall and exacerbated his mobility issues.

19.    Mr. Carter's relocation violated the accommodations provided by his medical pass, which limited the extent of his walking, among other activities, due to his medical condition.  Upon information and belief, Deputy Superintendent Akinyombo ordered Mr. Carter's jail cell relocated in retaliation for Mr. Carter's openly expressed complaints concerning the failure to schedule his medically necessary hip replacement surgery.

**Mr. Carter Files Suit Against Defendants**

20.    Mr. Carter brings this lawsuit against Defendants Mulvihill, Ngbodi, and Akinyombo pursuant to 42 U.S.C. § 1983 for violations under the Eighth Amendment to the United States Constitution.  Mr. Carter also asserts a claim against Defendant Akinyombo pursuant to 42 U.S.C. § 1983 for violating his rights under the First Amendment to the United States Constitution.

21.     Defendants Mulvihill, Ngbodi, and Akinyombo acted with deliberate indifference to Mr. Carter's medical needs and failed to take reasonable steps to schedule a necessary hip replacement surgery to ameliorate his excruciating pain and severely limited mobility. Defendant Akinyombo retaliated against Mr. Carter for complaining about his inadequate medical care by relocating him within Fishkill in a manner that violated the terms of his medical pass—intending to cause and in fact causing Mr. Carter additional pain and suffering.

22.     Defendants Mulvihill, Ngbodi, and Akinyombo are all DOCCS employees.  They are sued in both their individual and official capacities.  Mr. Carter seeks compensatory damages, punitive damages, costs of suit including reasonable attorneys' fees, and other appropriate relief.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this lawsuit implicates a federal question under 42 U.S.C. § 1983 and the First and Eighth Amendments to the United States Constitution.

24.     Venue is proper within the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this district.

## PARTIES

25.     Plaintiff James Anthony Carter Jr. is a 61-year-old resident of Queens, New York, who was incarcerated at Bare Hill Correctional Facility in Malone, New York, and at Fishkill Correctional Facility in Beacon, New York, between 2016 until 2021.

26.     Defendant Mulvihill was a Nurse Practitioner at Bare Hill in 2018.  She is sued in her individual and official capacity.

27.     Defendant Katie Ngbodi was a Nurse Practitioner at Fishkill between 2018 and 2021.  She is sued in her individual and official capacity.

28.     Defendant Akinola Akinyombo was the Deputy Superintendent for Health Services at Fishkill between 2018 and 2021 and was responsible for supervising medical personnel and addressing the medical needs of inmates.  He is sued in his individual and official capacity.

## JURY DEMAND

29.     Mr. Carter demands a jury trial in this action.

## FACTUAL ALLEGATIONS

### A.     Mr. Carter Is Twice Attacked By Prison Officials At Bare Hill, And Nurse Mulvihill Refuses To Treat Him

30.     On or about March 24, 2018, Mr. Carter was in his jail cell at Bare Hill, listening to his new bunkmate share a story, when an officer suddenly reprimanded Mr. Carter for talking in his cubicle.  Attempting to defuse the situation, Mr. Carter offered to go to the day room to speak with his bunkmate because talking was permitted there.  The officer informed him, as Mr. Carter recalls, that he "wasn't going anywhere" because he was "cube confined" and would be disciplined for his misbehavior.

31.     A few minutes later, the officer called two sergeants to Mr. Carter's cell, and they along with another officer snatched his cane from him and threw it to the ground.  They then took Mr. Carter between the doors of two adjacent jail cells where they vigorously beat him—focusing their fury, with deliberate precision, on Mr. Carter's lower back and hip.  The officers beat Mr. Carter repeatedly while he screamed, protested, and pleaded with them to avoid hitting him on his

hip.  The officers ignored Mr. Carter's pleas, instead aiming each jab at Mr. Carter's hip and lower

back, to maximize his pain and injury.

32.     Following this attack, Mr. Carter was unable to walk.  When he tried to move, he

experienced severe pain.  Even with the assistance of his cane, he could walk only at an extremely

slow pace.

33.     Needing immediate medical attention after the beating, Mr. Carter asked the officer

on duty to contact the prison hospital so that he could be examined by a doctor.  The officer

responded "sure," but did nothing to seek care for Mr. Carter.  Instead, approximately 10 minutes

later, two sergeants and an officer arrived and took Mr. Carter out of his jail cell, telling him, as

he recalls, that he "wouldn't need" his cane and should leave it there.  At this point, Mr. Carter

believed that he was being taken to the hospital for treatment and went willingly with the officers.

They handcuffed him, put him in a jail van, and drove away.

34.     They arrived at a different part of Bare Hill known as "the box"—a solitary

confinement unit—where they stopped.  The officers took Mr. Carter out of the van and brought

him inside.  They told him to stand in the corner, put his hands up against the wall, and not move.

Mr. Carter complied.  Upon information and belief, the area of the box where the officers sent Mr.

Carter to stand does not contain any video surveillance.

35.     Before the officers approached Mr. Carter, they put on black gloves.  They began

vigorously hitting him—again targeting the lower half of his body, including his hips, calves, and

thighs.  As the officers began to move up his body, Mr. Carter told the officers that he had a severe

hip problem.  One of the officers said, "Oh, yeah?"  Then all three of them began striking him,

zeroing in on his hip.  The officers shouted racial slurs at Mr. Carter, repeatedly calling him the

N-word as they hit him—to the point that Mr. Carter believed he would lose consciousness.  Upon

information and belief, the officers wore black gloves when they attacked Mr. Carter because this minimizes the exterior signs of injury. Mr. Carter estimates that this attack continued for approximately 10-15 minutes.

36.    When the officers finally stopped, Mr. Carter was in agony and desperately needed medical attention. He eventually was seen by Nurse Mulvihill, a registered nurse at Bare Hill, but she failed to examine Mr. Carter or evaluate his injuries in any way. Nor did she offer him any medication or treatment. Instead, Nurse Mulvihill glanced at Mr. Carter from the entrance of the room in which he was attacked and simply said that "everything is fine." Then she walked away. Upon information and belief, other inmates who were in solitary confinement in the box that day saw or heard Mr. Carter's beating by correctional officers and saw or heard Nurse Mulvihill declare that Mr. Carter was fine without examining him.

37.    After Nurse Mulvihill failed to provide any medical treatment, an officer took Mr. Carter to a cell in the box and placed him in solitary confinement. The officer told him: "Come on, ain't nobody going to hit you anymore."

38.    Mr. Carter remained in the box and continued to complain about the severe pain he was experiencing. The next day, following a shift change, Mr. Carter asked the new officers assigned to the box for medical treatment. Mr. Carter was taken to the prison clinic, where he was seen by a nurse. The nurse took pictures of Mr. Carter's injuries—but from such a distance that it was difficult to see the bruises on his body.

39.    Mr. Carter informed the nurse that he had been beaten by prison guards for talking in his jail cell and then beaten a second time even more severely—with each attack focused on his vulnerable hip. Before completing the medical report for the visit, the nurse asked the sergeant who had escorted Mr. Carter to the clinic what to write. Mr. Carter was incredulous that the nurse

was asking a corrections official how to describe his medical condition.  The sergeant told the nurse to write that Mr. Carter reported an "alleged assault by officers."  This is what the nurse wrote down.

40.     Several days later, Mr. Carter was visited by a Lieutenant Rich, who called him out of his jail cell and brought him to a separate room.  Lieutenant Rich placed a tape recorder on the table as Mr. Carter began to speak to him about what had happened.  Upon information and belief, a tape recorder, or similar recording device, is commonly used to create a record of conversations between prison officials and inmates.  However, as the meeting began, Lieutenant Rich took off his sunglasses, looked Mr. Carter in the eye, abruptly moved the tape recorder to the side—*without* starting it, and asked Mr. Carter if he was from New York City.  Mr. Carter responded that he was.

41.     As Mr. Carter recalls, Lieutenant Rich told him: "You're 350 miles away from the city.  You are up here with us, and this is my family.  All of the officers, all of them are my family.  What would you think if someone in your family was in trouble? You're going to look out for them, right?  You claim 'assault' but this is my family, and we didn't assault you.  Whatever happened to you was deserved because you disrespected my officers by talking in the cube.  Your black ass is too far from home to be messing with us up here.  Whenever you're released to your housing unit, don't tell anyone what happened because if we hear about this we're just gonna come back and take care of you and it will be worse next time.  We'll kill you up here and lose you."  Lieutenant Rich repeatedly called Mr. Carter the N-word and threatened to "make up some charges" and send Mr. Carter to "Upstate Box," a facility located behind Bare Hill.  Upon information and belief, Lieutenant Rich chose not to use the tape recorder he brought to the meeting with Mr. Carter in order to ensure that there was no record of the threats, racial slurs, and other derogatory statements that he made to Mr. Carter.

42.     A day or two later, Mr. Carter had a disciplinary hearing before a lieutenant to determine his punishment for talking in his jail cell.  Mr. Carter was given 22 days in the box as punishment, and his yard, commissary, and recreation privileges were revoked for 30 days.  Mr. Carter served approximately 20 days in the box; he was released a couple of days early to make room for another inmate.

43.     After he served this punishment, Mr. Carter filed a grievance with the Incarcerated Grievance Resolution Committee ("IGRC") describing the pain he had experienced from the violent and unprovoked assaults by Bare Hill officials.

44.     Mr. Carter also called his mother, Lucille Carter, and his sister, Pinkie Terrell Carter, to tell them what happened.  Mr. Carter told his mother and sister that he feared for his safety and well-being, that he was not receiving any medical treatment, and that Lieutenant Rich had threatened that he would be beaten even more severely and potentially killed if he told anyone what had happened. He also described the traumatic and hurtful verbal attacks that were hurled at him by prison officials, including the constant use of humiliating racial slurs, like the "N-word," commonly used to denigrate and demean African Americans.

45.     Mr. Carter's sister was very concerned for her brother and immediately called officials in Albany, New York, and tried to find someone with the authority to transfer him to another prison facility closer to family members in New York City.  Mr. Carter's sister ultimately reached someone with authority over inmate housing who was then able to speak with Mr. Carter by phone.  The person informed Mr. Carter that he would be transferred from Bare Hill to another correctional facility—Fishkill.

**B.     Mr. Carter Is Transferred To Fishkill, Diagnosed With Degenerative Osteoarthritis, And Recommended For Surgery**

46.     On or about May 18, 2018, Mr. Carter was transferred from Bare Hill to Fishkill.

Mr. Carter was still in extreme pain due to the beatings he had suffered at Bare Hill. He could barely walk and he struggled to tune out the pain while sleeping.

47.    On or about June 12, 2018, Mr. Carter wrote to the IGRC requesting a thicker or second mattress for his bed, explaining that he was unable to sleep through the night due to the pain.

48.    On or about June 15, 2018, Deputy Superintendent Akinyombo submitted a response to the IGRC stating that the mattress Mr. Carter had been issued was standard for all inmates and that he should contact the prison clinic for assistance with pain management. On or about June 28, 2018, Mr. Carter received a response from the IGRC denying his grievance.

49.    On or about July 1, 2018, Mr. Carter saw a prison physician, Dr. Frederick Bernstein, explaining that he was experiencing excruciating pain in his left hip, could not move without a cane, and even with one moved very slowly. He informed Dr. Bernstein that he was unable to finish many of his meals because he arrived so late to the dining hall due to his difficulty walking.

50.    On or about July 3, 2018, Dr. Bernstein performed blood work on Mr. Carter, which showed that he had a low hemoglobin level of 9.8. A normal hemoglobin level for men, according to the Cleveland Clinic, ranges from 14 to 17.5.[6] Mr. Carter's low hemoglobin level was consistent with anemia, and his medical records indicate that he continued to complain of severe hip pain. Dr. Bernstein did not inform Mr. Carter that he had anemia.

51.    On or about August 23, 2018, Dr. Bernstein ordered an x-ray of Mr. Carter's left and right hips. On or about August 31, 2018, Dr. Bernstein reviewed the x-ray results and

---

[6] Cleveland Clinic, "Low Hemoglobin," *available at*
https://my.clevelandclinic.org/health/symptoms/17705-low-hemoglobin

determined that Mr. Carter had "degenerative osteoarthritis severe" in his left hip and moderate degenerative osteoarthritis in his right hip. Dr. Bernstein prescribed Tylenol for short-term pain management, but he informed Mr. Carter that the ***only way*** to relieve the severe pain that he was experiencing was to surgically replace his left hip, a procedure Dr. Bernstein recommended.

### C.    Nurse Ngbodi Refuses To Schedule Mr. Carter's Hip Surgery And Fails To Treat His Anemia

52.    On or about September 3, 2018, Nurse Ngbodi reviewed Dr. Bernstein's report confirming that Mr. Carter had degenerative osteoarthritis in his hips. Nurse Ngbodi indicated that she agreed with Dr. Bernstein's diagnosis and would schedule a consultation for Mr. Carter. Upon information and belief, Nurse Ngbodi knew that osteoarthritis is a degenerative condition and knew that Mr. Carter's injury was already significant given Dr. Bernstein's diagnosis.

53.    On or about September 17, 2018, Mr. Carter saw Nurse Ngbodi, who told him that Dr. Bernstein had requested that she arrange for Mr. Carter to consult with another doctor about his hip condition, but it had not yet been scheduled. Nurse Ngbodi informed Mr. Carter that she agreed with Dr. Bernstein's diagnosis that the only way to stop the pain was through hip replacement, and that she would place a request for a consultation.

54.    On or about October 24, 2018, Mr. Carter again saw Nurse Ngbodi, who told him that, contrary to what she previously said, she had not requested a consultation for him with a doctor about his degenerative osteoarthritis. Nurse Ngbodi told Mr. Carter that she believed that the central office in Albany would not approve his hip replacement surgery, and she was "not going to waste time" by putting in a request. Mr. Carter also asked for an injection of pain medication to help to manage his severe pain, but Nurse Ngbodi refused the request.

55.    On or about November 8, 2018, Mr. Carter again saw Nurse Ngbodi. Nurse Ngbodi again informed Mr. Carter that she was not going to make a request for the required hip

14

replacement surgery because she did not believe it would be approved by the central office in Albany and she did not want to "look bad" by making a request and having it denied. Mr. Carter again asked for an injection to manage his excruciating pain. This time, Nurse Ngbodi gave him 400mg of ibuprofen (the equivalent of two Advil) which did nothing to alleviate his pain.

56.    Mr. Carter continued to suffer extraordinary pain. He was barely able to walk, even with the assistance of a cane, and was often unable to sleep through the night due to pain. Mr. Carter was still missing numerous meals because he was unable to get to the mess hall in time, even with his cane. Nonetheless, Nurse Ngbodi did not request a consultation with an orthopedist to schedule Mr. Carter's hip replacement surgery even though Dr. Bernstein had informed her and Mr. Carter that this was the ***only way*** to stop the pain—a diagnosis Nurse Ngbodi agreed with. Nurse Ngbodi also refused to give Mr. Carter additional pain injections or other adequate medication to treat his extreme pain. Nurse Ngbodi also knew that Mr. Carter had been diagnosed with anemia, but she took no steps to raise his hemoglobin levels by prescribing medication or providing iron-rich meals.

57.    Nurse Ngbodi acted with deliberate indifference to Mr. Carter's medical condition by refusing to schedule a consultation with an orthopedic specialist even though she knew that hip replacement surgery was the only way to address Mr. Carter's severe pain and injury, by failing to prescribe adequate pain management to address the extreme pain associated with his severe injuries, and by failing to treat his anemia.

**D.    Mr. Carter Is Finally Referred To An Orthopedist And Scheduled for Surgery, But The Surgery Never Happens**

58.    On or about November 18, 2019, Mr. Carter filed a new grievance with the IGRC describing the Fishkill medical staff's failure to provide him with adequate medical care throughout what was then ***18 months*** at the facility. Mr. Carter recounted Nurse Ngbodi's failure

to refer him to a consultation with an orthopedist despite his begging her to do so.  Mr. Carter stated that he was in severe pain and his degenerative hip condition frequently caused him to fall when getting out of bed.  Mr. Carter made clear in this grievance that he was "begging for help to stop this pain."

59.    On or about December 3, 2019, Deputy Commissioner Akinyombo responded to Mr. Carter's grievance and sent a memorandum to IGRC stating that Mr. Carter had "been scheduled to see orthopedic [*sic*] in the nearest future."  Upon information and belief, Defendant Akinyombo knew that osteoarthritis is a degenerative condition and that Mr. Carter's condition had already worsened since his original diagnosis.  Defendant Akinyombo knew that, in August 2018, Mr. Carter had been diagnosed with "degenerative osteoarthritis severe" in his left hip and knew that Mr. Carter was experiencing severe pain and begging for medical treatment.

60.    On or about December 10, 2019, Mr. Carter was seen by Dr. Schwartz, an orthopedic surgeon from Mount Vernon Hospital.  Dr. Schwartz noted that Mr. Carter was experiencing "severe hip pain" that had begun approximately a year and a half earlier and had "bec[o]me more severe."  He recommended that Mr. Carter be referred to another Mount Vernon Hospital orthopedist, Dr. Jonathan Holder, for further evaluation and potential surgery.

61.    On or about December 19, 2019, Dr. Holder evaluated Mr. Carter and recommended that he be scheduled for surgery for "total hip replacement," reaching the same conclusion that Dr. Bernstein had reached more than a year earlier.  After Dr. Holder's diagnosis, Mr. Carter's surgery was scheduled to take place on or about January 15, 2020.

62.    On or about January 15, 2020, Mr. Carter appeared for his scheduled surgery and waited in the facility dorm.  An EKG test was completed—an electrocardiogram test used to record the electrical signals in the heart—and his medical charts were provided for review.  However, for

16

reasons that remain unclear, Mr. Carter was never called in for his surgery, despite waiting all day in the facility dorm for the procedure to begin.

63.    On or about January 27, 2020, Mr. Carter visited sick call, and demanded an explanation about why his hip replacement surgery had not taken place.  On this same day, a prison medical provider noted that Mr. Carter was scheduled for total hip replacement and was "having severe pain."

64.    On or about February 24, 2020, Mr. Carter again went to sick call complaining that he was experiencing severe pain.  He informed the prison officials at sick call that he was still awaiting hip replacement surgery, which he desperately needed to stop the pain.

**E.    Deputy Superintendent Akinyombo Repeatedly Relocates Mr. Carter Within Fishkill In Violation Of His Medical Pass, And Informs Mr. Carter That He Will Have To Wait Until His Release For Surgery**

65.    As Deputy Superintendent of Health Services, Defendant Akinyombo was responsible for investigating and responding to "patient concerns" at Fishkill.[7]  Yet Defendant Akinyombo routinely walked away when Mr. Carter tried to stop him in the hallway to discuss when his hip replacement surgery would take place, saying "I've got to go," "I've got to go," or providing another similar excuse to avoid addressing Mr. Carter's request.  Defendant Akinyombo described Mr. Carter as a "whiner" and a "complainer" because of his repeated open requests for medical treatment. Upon information and belief, other prison officials at Fishkill also described Mr. Carter as a "complainer" given his frequent complaints about the extreme pain that he was in and continuous requests for his medically-necessary hip surgery.

66.    On or about March 18, 2020, Mr. Carter submitted yet another grievance to the

---

[7] "Fishkill Correctional Facility," *Correctional Association of New York* at 17, *available at* https://www.prisonpolicy.org/scans/correctional_association/fishkill.pdf

IGRC, stating that he was still in severe pain and awaiting surgery, which multiple medical professionals deemed necessary for treating his severe pain.  Mr. Carter was told that Dr. Holder had a long list of surgeries to perform and that he was on that list.  Upon information and belief, these types of surgeries were paused on or about this date due to the COVID-19 pandemic.

67.    On or about March 30, 2020, Defendant Akinyombo submitted a memo to the IGRC stating that he had raised the priority level for Mr. Carter's surgery and that it would be "scheduled in the nearest future."

68.    On or about April 2020, the IGRC denied Mr. Carter's grievance arising from the prison's failure to schedule his medically necessary hip replacement surgery.

69.    On or about April 27, 2020, the IGRC informed Mr. Carter that the Office of the Deputy Superintendent for Health Services had conducted an investigation and, as a result, the priority level for his surgery had been raised.

70.    On or about May 1, 2020, Mr. Carter appealed the IGRC's denial of his grievance describing the Fishkill medical staff's failure to provide him with adequate medical care for his debilitating degenerative osteoarthritis condition, and stated that he had been complaining about his excruciating pain in his left hip since arriving at Fishkill in May 2018.  Because nothing had been done to schedule his surgery, Mr. Carter told the IGRC that he believed that the Fishkill medical staff were delaying the procedure until his meeting with the parole board in November 2020.

71.    On or about May 29, 2020, Mr. Carter personally spoke with Deputy Superintendent Akinyombo while he was coming through Mr. Carter's unit doing his rounds and again asked for information about when his surgery would take place—explaining that the pain he was experiencing was incredibly severe.  Defendant Akinyombo informed Mr. Carter that he had

raised the priority level for his surgery and stated that he might be relocated from A/C center to the main building at the front of the facility where he would be closer to the law library, the commissary, and the medical unit.

72.    Mr. Carter asked Deputy Superintendent Akinyombo why he would move him to the last building in the facility—a unit farther from the Regional Medical Unit (RMU), the law library, and the commissary—when he could barely walk, even with the assistance of a cane.

73.    Mr. Carter showed Defendant Akinyombo his medical pass, which read: "No work, no stair climbing, must be housed on the flats, no prolonged walking (longer than 10 minutes), no lifting over 10-15 lbs., may need help lifting 7.15 lbs or more, hearing aid/cane/back brace, no work on ladder or heights, no work for food services, no yard, may watch T.V., medical reason-physical reason."  Mr. Carter explained that the move would cause more hardship for his painful condition.  Defendant Akinyombo responded by saying only: "We will see."

74.    On or about June 16, 2020, Mr. Carter again requested further information from Deputy Superintendent Akinyombo about scheduling his hip replacement surgery, but received no response.

75.    On or about June 29, 2020, Mr. Carter was informed by a nurse and a transportation officer that inmates could once again travel to medical facilities for knee, hip, and back surgeries following the temporary pandemic-related lockdown.

76.    On or about July 14, 2020, Mr. Carter tested positive for COVID-19 and was quarantined from other inmates.

77.    On or about July 25, 2020, Mr. Carter was released from quarantine and returned to the general population.  He learned that Deputy Superintendent Akinyombo had relocated his cell in 21A building upstairs to L unit.  This location was even further from the places at Fishkill

that Mr. Carter most frequently visited, including the RMU, the law library, and the commissary. Deputy Superintendent Akinyombo knew that relocating Mr. Carter to this new cell violated the accommodations required by his medical pass because he was not housed on the flats and would be required to walk more than 10 minutes to get to essential locations at Fishkill.

78.    Mr. Carter immediately wrote to Deputy Superintendent Akinyombo to ask why he had been relocated to a cell that required him to do extensive walking and stair climbing, in violation of his medical pass, and was not located on the ground level.

79.    On or about July 27, 2020, a prison officer told Mr. Carter to pack up his belongings because he was being moved downstairs to J gallery in the 21A building.  Mr. Carter informed Deputy Superintendent Akinyombo that moving him to J gallery would only exacerbate his injuries and cause him even more pain.  To Mr. Carter, given his extreme injuries, it felt like he was walking "a mile and a half" to the RMU, law library, and commissary.

80.    Mr. Carter's medical pass limited him to ten minutes of walking, and it was impossible for him to walk to the RMU, law library or commissary in ten minutes.  Despite his known injuries, Mr. Carter was nevertheless moved to the J gallery, which forced him to walk for *approximately 30 minutes*—about three times the amount of time—in order to get to the RMU.

81.    The move to the J gallery required Mr. Carter to walk from his housing unit, down long corridors with multiple twists and turns, and to walk down several long hallways just to get out of the building.  This process alone would take him approximately 15 minutes.

82.    To make matters worse, once Mr. Carter was out of the building, it took Mr. Carter yet another 15 minutes to get to the RMU, law library or commissary, which were all located up a hill, which was approximately three or four city blocks away.  As a result, the total time for Mr. Carter to walk from his cell at the J gallery to the RMU, law library, or commissary was

approximately 30 minutes.

83.     By contrast, when Mr. Carter walked to the RMU, law library, or commissary from his prior cell location it would take approximately 7 minutes. Moreover, the walk was flat and did not involve walking up any hills. Upon information and belief, Deputy Superintendent Akinyombo knew that moving Mr. Carter's cell would not only aggravate his injuries and increase his extreme pain, but also limit Mr. Carter's ability to advocate in person for the hip replacement surgery that he so desperately needed.

84.     On or about August 17, 2020, Mr. Carter wrote to Deputy Superintendent Akinyombo asking to be relocated to a unit at Fishkill that was consistent with the requirements of his medical pass. Mr. Carter begged to be relocated to a cell within a reasonable distance of the RMU, law library, and commissary.

85.     On or about August 30, 2020, Mr. Carter again wrote to Deputy Superintendent Akinyombo inquiring about the scheduling of his hip replacement surgery. Deputy Superintendent Akinyombo failed to respond and did not relocate Mr. Carter to a unit in a location that was consistent with the requirements of his medical pass.

86.     On or about September 25, 2020, Mr. Carter again wrote to Deputy Superintendent Akinyombo inquiring about the scheduling of his hip replacement surgery. He received no response.

87.     On or about September 29, 2020, at approximately 4 p.m., Mr. Carter spotted Deputy Superintendent Akinyombo making his rounds through J gallery. Mr. Carter asked him about scheduling the hip replacement and communicated the severe pain he was experiencing. He also asked about the purportedly increased priority level for his surgery—and what value that had, given that *more than two years* had elapsed since Dr. Bernstein determined it was the only way to

stop his pain.  Deputy Superintendent Akinyombo stated that they were still waiting on Dr. Holder's availability because "he will be the one who will perform the surgery.  So until we hear from him, you have to wait."

88.    Mr. Carter asked Deputy Superintendent Akinyombo why he didn't transfer him to another facility with better access to a surgeon given his authority over inmate health.  Defendant Akinyombo responded by asking when Mr. Carter was scheduled to appear before the parole board.  When Mr. Carter informed Deputy Superintendent Akinyombo that his parole would be considered in November 2020, Mr. Akinyombo responded: "Good.  We don't have to send you out; you could have surgery when you get out."  Defendant Akinyombo's conversation with Mr. Carter was witnessed and overheard by inmate Lawrence Holloway (ID# 19A1094).

89.    Defendant Akinyombo acted with deliberate indifference to Mr. Carter's medical needs by repeatedly failing to schedule his necessary hip replacement surgery, a delay designed to ensure that it did not occur while Mr. Carter was an inmate at Fishkill.  Further, Defendant Akinyombo retaliated against Mr. Carter for complaining about the failure of the medical staff to schedule his surgery, his extreme pain, and Defendant Akinyombo repeatedly moving him within Fishkill in violation of his medical pass.

**F.    Mr. Carter Is Finally Sent For An Orthopedic Consultation, And Surgery Is Scheduled For A Date Before His Release**

90.    On or about October 20, 2020, the nurse who was treating Mr. Carter received a call from New York Assistant Attorney General Margaret Cieprisz, who stated that she wanted to "discuss [Mr. Carter's] complaints to [his] provider."

91.    On or about November 9, 2020, another x-ray was taken of Mr. Carter's left hip, and a provider confirmed what had been known since August 2018: he suffered from severe degenerative osteoarthritis.  Mr. Carter was promptly scheduled for a consultation with a primary

provider and an orthopedic specialist.

92.     On or about November 2020, the parole board reviewed Mr. Carter's case and granted his request for parole.  His release date was set for March 2021.

93.     On or about December 3, 2020, after hearing additional complaints from Mr. Carter, his medical providers, who upon information and belief included Nurse Practitioner M. Baby, attempted to again schedule Mr. Carter's hip replacement surgery "ASAP."  At this point, *more than 27 months* had passed since Dr. Bernstein determined that hip replacement surgery was the only way to stop Mr. Carter's debilitating pain.

94.     On or about December 31, 2020, Mr. Carter collapsed in his cell, and security responded to check on him.  He informed the officers that his "hip gave out" and he had fallen to the ground.  Mr. Carter was admitted to the infirmary for treatment.

95.     On or about January 2021, Mr. Carter underwent physical therapy to help recover from the injuries he suffered in his fall.

### G.     Mr. Carter's Surgery Is Rescheduled For February 11, 2021, But Canceled Due To His Untreated Anemia

96.     On or about February 4, 2021, blood test results again showed that Mr. Carter had extremely low levels of hemoglobin consistent with anemia.

97.     On or about February 10, 2021, Mr. Carter was admitted to the infirmary in preparation for his surgery, which was scheduled for February 11, 2021, at Mount Vernon Hospital.  Based on Mr. Carter's prior blood work, an x-ray technician in the infirmary observed that his hemoglobin count appeared very low and informed Mr. Carter that he did not know if the surgery would actually be able to take place.

98.     On or about February 11, 2021, Mr. Carter was transported to Mount Vernon Hospital for surgery.  Mr. Carter's blood test results continued to show very low hemoglobin levels

consistent with anemia.  The physician scheduled to perform the hip replacement surgery, Dr. Holder, informed Mr. Carter that because his hemoglobin level had dropped to 5.0, he could not perform the surgery because Mr. Carter would "bleed out" due to his severe anemia.

99.    Dr. Holder ordered an emergency blood transfusion.  Mr. Carter received three packed red blood cell transfusions, bringing his hemoglobin level up to 7.3.  But Dr. Holder determined that Mr. Carter's hemoglobin level was still too low to safely perform the surgery.

100.    For the next two weeks, Mr. Carter remained at Mount Vernon Hospital, where he was prescribed medication to raise his hemoglobin level and placed on a high iron diet.  At the end of this period, his hemoglobin level had risen to 9.7, but this was still too low for surgery.

101.    Mr. Carter's medical providers had identified his severe anemia no later than July 2018, but they *never treated* him for this condition.  The emergency blood transfusion that Mr. Carter received at Mount Vernon Hospital in February 2021 was insufficient to cure a medical problem that had been allowed to fester for at least *two and a half years*.

102.    On or about February 25, 2021, Mr. Carter was discharged from Mount Vernon Hospital without undergoing hip surgery and sent back to Fishkill.  When Mr. Carter arrived at Fishkill and told a nurse that the hip replacement surgery had not happened, she noted the failure of his medical providers to treat his anemia and stated: "someone's in trouble."  At this point, it was only a matter of days before Mr. Carter would be released on parole.

**H.    Mr. Carter Is Released From Prison On March 23, 2021, And Finally Has Hip Replacement Surgery**

103.    On or about March 23, 2021, Mr. Carter was released from Fishkill.

104.    After his release from Fishkill, Mr. Carter immediately searched for a doctor to perform the hip replacement surgery he desperately needed.  Less than a month later, on April 20, 2021, Dr. Tyler Lucas, an orthopedic surgeon at Metropolitan Hospital, surgically replaced Mr.

Carter's left hip.  Medicaid covered the cost.

105.    Following the surgery, Mr. Carter's hip pain was greatly reduced, but he continues to experience a constant ache in his left hip.  Mr. Carter has consulted with doctors to try to reduce the soreness which has not been successful.  He has been told that the hip replacement surgery was correctly performed, and his physicians have not found any way to mitigate his soreness.  Upon information and belief, the ***nearly three-year delay*** between when Mr. Carter was told that hip replacement surgery was required and when the procedure was performed greatly exacerbated his pain and injuries.  Because of this unnecessary delay, he now lives with daily soreness in his hip and has difficulty walking in a steady and straight way.

## FIRST CAUSE OF ACTION

### *42 U.S.C. § 1983 – Deliberate Indifference in Violation of the Eighth Amendment (as to all Defendants)*

106.    Mr. Carter repeats and realleges the foregoing paragraphs, which are expressly incorporated herein.

107.    Defendant Mulvihill acted with deliberate indifference to Mr. Carter's medical needs because she failed to examine him after he was severely beaten by prison officials at Bare Hill, and instead determined without any evidence that he was healthy and required no medical treatment.

108.    Defendants Ngbodi and Akinyombo acted with deliberate indifference to Mr. Carter's medical needs because they failed to provide adequate pain management for his injuries at Fishkill and failed to take steps to schedule a necessary hip replacement surgery to treat his degenerative osteoarthritis.  Defendant Ngbodi acted with deliberate indifference to Mr. Carter's medical needs because she failed to treat his anemia.

109.    Defendants Ngbodi and Akinyombo acted with deliberate indifference to Mr.

25

Carter's medical needs by ignoring the orders of Drs. Bernstein, Schwartz, and Holder and by failing to refer Mr. Carter to an orthopedic specialist or taking other steps to schedule the surgery.

110.    Defendant Akinyombo acted with deliberate indifference to Mr. Carter's medical needs because he expressly told Mr. Carter that he would delay scheduling the hip replacement surgery until after Mr. Carter was released from Fishkill.

111.    Defendant Akinyombo acted with deliberate indifference to Mr. Carter's medical needs by repeatedly relocating Mr. Carter to far-flung prison cells at Fishkill that were inconsistent with the conditions of his medical pass because they were farther away from and/or made it impossible for him to access critical prison services.

### SECOND CAUSE OF ACTION

#### *42 U.S.C. § 1983 – Retaliation in Violation of the First Amendment*
#### *(as to Defendant Akinyombo)*

112.    Mr. Carter repeats and realleges the foregoing paragraphs, which are expressly incorporated herein.

113.    Mr. Carter's numerous grievances and complaints about his severely delayed medical treatment are speech protected by the First Amendment to the United States Constitution.

114.    Upon information and belief, in retaliation for Mr. Carter's grievances and openly expressed complaints, Defendant Akinyombo repeatedly reassigned Mr. Carter to new jail cells within Fishkill in a manner that clearly violated the terms of his medical pass and was intended to and did cause him additional pain and suffering.  Upon information and belief, Defendant Akinyombo's retaliatory actions were an attempt to silence Mr. Carter's speech.  There was no legitimate reason for repeatedly moving Mr. Carter within Fishkill, and upon information and belief Defendant Akinyombo took this action to punish Mr. Carter for candidly voicing concerns about his objectively inadequate medical care.

115.    As a direct and proximate result of Defendant Akinyombo's violations of the First Amendment, Mr. Carter suffered further physical and emotional harm.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief and enter judgment in his favor:

A.    awarding compensatory damages for the violations of his constitutional, statutory, and common law rights in an amount to be determined at trial;

B.    awarding punitive damages against Defendants;

C.    awarding reasonable attorneys' fees, costs, and disbursements under 42 U.S.C. § 1988; and

D.    granting such other relief as this Court deems just and proper.


Dated:    October 31, 2024
          New York, NY

*/s/ Nexus Sea*
Nexus U. Sea
Michael M. Klotz
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone: (212) 326-2000
nsea@omm.com
mklotz@omm.com

*Limited pro bono counsel for*
*James Anthony Carter Jr.*